COMMONWEALTH *vs.* SAMUEL RUDNICK.

Suffolk.     December 4, 1944. — March 13, 1945.

Present: FIELD, C.J., QUA, DOLAN, RONAN, & WILKINS, JJ.

*Conspiracy. Building. Boston. Practice, Criminal,* Exceptions: whether error harmful, general exception; New trial. *Evidence,* Competency, Conspiracy, Contradiction of witness, Cumulative. *Custom. Witness,* Contradiction. *Error,* Whether error harmful.

A conviction under an indictment charging conspiracy to violate the building law of Boston, St. 1907, c. 550, in certain particulars was warranted if there was evidence of a conspiracy to violate it in any one of such particulars.

A finding, that a builder engaged to make alterations in a building in Boston, a plan of which had been approved by the building department of the city, was guilty of conspiring to violate the Boston building law, was warranted by evidence that both he and one who could be found to have been "at the head and front of the whole enterprise" knew that the building law required the plan to be followed in making the alterations, and that the builder, with the knowledge and approval of the other person, directed a material departure from the plan with respect to the location in which certain rooms were installed, thereby eliminating a "passage to street" shown on the plan.

An alleged custom to do building alteration work in Boston in a manner varying from the alteration plan approved by the city building department and afterwards to procure approval from the department would furnish no defence to a criminal charge of conspiracy to violate the provision of the Boston building law requiring the alteration to be performed in accordance with the plan.

At the trial of an indictment for conspiracy, where there was evidence that several defendants were conspirators with one another and with a third person, the allowance of a motion by the Commonwealth, presented at the close of its case, that evidence of the acts done and declarations made by the third person and by the defendants in pursuance of the alleged conspiracy be admitted against each of the defendants showed no error respecting one who was convicted, although the others were acquitted.

Evidence that a previous witness had not attempted to purchase certain materials was admissible to contradict him where, although he at first had testified that he had not sought to purchase them, thereafter he had testified that if he had stated before the trial that he had tried to get the materials, "then he had tried," and that his answer was not that he had never tried to get them.

The admission or exclusion of evidence which is merely cumulative rarely constitutes prejudicial error.

An exception to a question asking for "the conversation" related to the whole conversation and must be overruled where part at least of the conversation was admissible.

Upon a motion for a new trial by one of several defendants who was convicted at the trial of an indictment for a conspiracy among the defendants and a third person, the other defendants being acquitted, there was no error in the denial of his requests for rulings that upon the issue whether the verdict was against the evidence or the weight of the evidence, the trial judge must disregard "the evidence admitted in the first place against defendants who have been acquitted and subsequently admitted against all defendants at the trial."

INDICTMENT, found and returned on May 19, 1943.

The case was tried before *Broadhurst*, J.

Certain of the defendant's requests for rulings were as follows:

"11. If it appears that the total area of the premises 59 and 65 Broadway is less than ten thousand feet, the burden is upon the Commonwealth to prove beyond a reasonable doubt that 59 and 65 Broadway are two separate buildings in order to convict the defendant Samuel Rudnick of conspiring with one or more of the other defendants to depart from the drawings approved by the building commissioner in respect to the openings in the wall between said buildings.

"12. Unless it appears that the wall between 59 and 65 Broadway was a partition wall, or in the alternate that the area of said buildings was ten thousand feet or more, the failure to provide the openings cut therein with fire doors as specified in the plan approved by the building commissioner (exhibit 3) was not a violation of" St. 1907, c. 550, § 31.

"14. The approval of the plumbing work by the building commissioner on or about October 16, 1942, in the location where the toilets were actually installed, validated the departure from the drawings approved by the building commissioner with respect to the location of said toilets.

"15. Upon all the evidence the rear wall of 17 Piedmont Street, which was cut through to provide a passageway to the cocktail lounge, was not a party wall within the meaning of" St. 1907, c. 550, § 11, subsection 9.

"16. It appearing from the testimony of the Common-

wealth expert that the rear wall of 17 Piedmont Street which was cut through to provide a passageway to the cocktail lounge was an independent wall not used for the support of any other building and was less than twelve inches in thickness, said wall as a matter of law did not separate two or more buildings and was not used or adapted for the use of more than one building.

"17. It appearing from the testimony of the Commonwealth expert that the rear wall of 65 Broadway which was cut through to provide a passageway to the cocktail lounge was an independent wall not used for the support of any other building and was less than twelve inches in thickness, said wall as a matter of law did not separate two or more buildings and was not used or adapted for the use of more than one building."

A portion of the charge was as follows: "If the wall separating 59 and 65 Broadway was used for the support of floors or roofs or both floors and roofs in both buildings, under the definition of a party wall in this building code, that wall was a party wall. The same is true of any other wall in any of those buildings. If in fact it was used for the support of two buildings or adapted to the use of two buildings, it was a party wall and under this Act no opening could be made in a party wall without installing fire doors therein."

*J. C. Johnston,* (*J. L. Yesley* with him,) for the defendant.

*J. K. Collins,* Assistant Attorney General, (*A. B. Cohen,* Assistant Attorney General, with him,) for the Commonwealth.

WILKINS, J. The indictment is in one count charging that, with knowledge of St. 1907, c. 550, §§ 12 and 31, Barnett Welansky, the defendant Rudnick, Reuben O. Bodenhorn, James Welansky, David Gilbert, and Theodore Eldracher from on or about June 1, 1942, continuously until May 1, 1943, conspired (1) to alter the buildings at 17 Piedmont Street, 4 and 6 Shawmut Street, and 59 and 65 Broadway, Boston, without a permit issued by the building commissioner of the city of Boston, (2) to alter the buildings in such a way that the work to be done was not to be

done in accordance with drawings bearing the approval of the commissioner, and (3) to make openings for doorways in party walls without installing in each opening two sets of fire doors separated by the thickness of the wall.[1] All except Barnett Welansky (hereinafter called Welansky) were put upon trial together. The defendant alone was found guilty by the jury, and the others were acquitted, Bodenhorn by order of the judge. The defendant's exceptions present the correctness of the judge's rulings in the denial of his motion for a directed verdict, in the recording of the verdict, in the admission and exclusion of evidence, in the denial of requests for instructions, and in the denial of a motion for a new trial and of requests for rulings presented in connection with such motion.

The buildings were to be used in connection with a restaurant known as the Cocoanut Grove (hereinafter called the Grove), in which a fire occurred November 28, 1942. See *Commonwealth* v. *Welansky*, 316 Mass. 383.

1. We first consider the motion for a directed verdict. The indictment charges but one offence, and the defendant might properly be convicted if there was evidence warranting a finding of a conspiracy to violate the statute in but a single respect. *Commonwealth* v. *Kimball*, 7 Gray, 328, 331. *Commonwealth* v. *Meserve*, 154 Mass. 64, 72–74. *McDonnell* v. *United States*, 19 Fed. (2d) 801, 803. *Andrews* v. *United States*, 108 Fed. (2d) 511, 515. G. L. (Ter. Ed.) c. 277, § 35. See *Frohwerk* v. *United States*, 249 U. S. 204, 209–210. Compare *Commonwealth* v. *Parrotta*, 316 Mass. 307. Accordingly, without intimating that proof of other violations was lacking, we shall deal with the sufficiency of the evidence relating to one violation only. The plan for alterations as filed and as approved by the building

---

[1] The indictment referred to the following parts of the statute: "No building, structure or foundation shall be constructed or altered without a permit, and such work shall be done in accordance with drawings bearing the approval of the commissioner" (§ 12). "Openings for doorways in party walls shall not exceed one hundred square feet each in area, and each opening shall have two sets of fire doors separated by the thickness of the wall, hung in a manner satisfactory to the commissioner, except that the aggregate width of all openings in any story shall not exceed fifty per cent of the length of the wall in which such openings occur" (§ 31).

department called for two toilet rooms to be located on the north wall of 59 Broadway, but actually these rooms were installed on the west wall, where the plan showed a "passage to street," which, in fact, in the course of the alterations was permanently blocked up.

Since the defendant was the only alleged conspirator who was both tried and convicted, the verdict of the jury means that he was found guilty of conspiracy with Welansky, who was not tried. The indictment being for conspiracy to commit an offence which is *malum prohibitum* only, there must have been an intent to do wrong on the part of both the defendant and Welansky, and both must have had knowledge of the existence of the law and knowledge of its actual or intended violation. *Commonwealth* v. *Benesch,* 290 Mass. 125, 134, 135. And there must have been a combination between them for concerted action to that end. *Commonwealth* v. *Hunt,* 4 Met. 111, 123, 125.

The jury could have found the following facts: The buildings, four in number, were in a group. The building at 17 Piedmont Street abutted Piedmont Street on the south and Shawmut Street on the north, and its northerly part, containing the main dining room, was adjacent to and to the west of, the building at 6 Shawmut Street. The building at 59 Broadway, also numbered 4 Shawmut Street, was adjacent on the west to the building at 6 Shawmut Street, and on the south to the building at 65 Broadway. The real estate at 17 Piedmont Street was owned by Welansky, and that at 65 Broadway was owned by him or his sister. In August, 1942, the other two buildings, owned by three individuals named Eichorn, were leased to Welansky, who assigned his interest to a corporation, New Cocoanut Grove, Inc., which held an alcoholic beverage and common victualler license at that time for 17 Piedmont Street, but later extended to cover all the buildings. On September 22, 1942, Welansky was elected president, treasurer, and "manager or principal representative" authorized to sign all applications for licenses, succeeding his brother, Benjamin Welansky. Previously, in August, 1942, as described below, four applications, one for each building, were filed with the

building department for the purpose of obtaining permits to make alterations in accordance with a plan. Briefly stated, the work contemplated a new cocktail lounge in the building at 65 Broadway to be connected by a passageway across the premises at 6 Shawmut Street to the main dining room at 17 Piedmont Street, openings in the wall between the buildings at 59 and 65 Broadway, and a foyer, checkroom, and two rooms for toilets in the building at 59 Broadway. One Feer, an architect, drew the plan, which was based on a layout sketch by Bodenhorn (whose relationship to the Grove is not clear), and filled out the blanks in the applications. He also prepared for each building a synopsis, which is substantially a copy of the application. The application and the synopsis for 6 Shawmut Street were signed by Feer on behalf of the owners, and the other applications and the synopses were signed by Welansky. All four applications were also signed by the defendant, a licensed mechanic, as required by ordinance.[1] Changes required by the building department were made on the original plan by Feer, and permits were issued under date of September 1. After approval of a plan the building department retains the original and a copy "stamped 'Approved' goes to the applicant who receives the permit and he is supposed to have the duplicate on the job while the work is being done." See St. 1907, c. 550, § 1. Another copy was required by, and intended for, the licensing board, with which it was filed September 2. The cocktail lounge was opened on November 17.

There was testimony that Welansky was active in connection with the alteration work. One Tracey testified that in May, 1942, he had been hired by Welansky as "handy man and maintenance man" at the Grove; that in September he "moved into" the upper floors of 4 Shawmut Street; that until November 16, when Welansky became ill (not to return until after the fire), he received orders from Welansky; and that some time in August, 1942, at the request of Welansky he hired workmen to work on some openings in

---

[1] Revised Ordinances of 1925 of the City of Boston, c. 10, §§ 5, 6.

the wall between 17 Piedmont Street and 6 Shawmut Street.
Feer testified that at 65 Broadway about August 20 he had
a conversation with the defendant, who said that Welansky,
whom the defendant referred to as the owner of the Grove,
was planning to add space at 59 and 65 Broadway, and
needed a plan to present to the licensing board for approval
of the liquor license extension; that he made three blue-
prints of a plan, and delivered them at Welansky's office;
that two or three days after the delivery of the plan he had
a conversation with Welansky at the office of the witness;
that in that conversation Welansky said that he had been
to the building department "to get a permit to do certain
work, to do the work in accordance with the plan, at Cocoa-
nut Grove," and had been told he would have to fill out
applications before a permit would be issued; that Welansky
produced three applications and asked for assistance in filling
them out; that the witness filled out the applications and
the synopses, and Welansky signed them; that Welansky
took the applications and the synopses to file with the plans;
that a day or two later Welansky telephoned that he had
been to the building department, where he had been told
certain changes must be made; that Welansky asked him
to go to the building department to make the required
changes; that the witness did so, and told Welansky that
he had been to the building department and made the
changes, and that a permit was ready to issue; that the
witness made the changes at the building department on the
three blueprints he had submitted to Welansky; that at
some time he told Welansky that he had filed the applica-
tion pertaining to 6 Shawmut Street after signing the name
of Eichorn, "the owner"; that before the witness went to
the building department Welansky told him to make what-
ever changes were necessary or required by the department
so that a permit might be issued; that Welansky made no
restrictions or limitations at all as to doing anything the
department might require; and that he followed the instruc-
tions and without protest made the changes exactly as
required.  One Scheingold, a carpenter, testified that in the
middle of August he worked four days putting a roof over

a little yard and fixing the wall of a wooden building in the rear of 6 Shawmut Street; and that the morning he started work Welansky and Gilbert (a business associate of the defendant) "gave the witness his orders." One Epple, secretary of the licensing board, testified that "sometime in July or August," at which time he knew Welansky "was connected with" the Grove, he talked with Welansky, who said he wanted to make certain changes "in his licensed premises," and that the witness told him that he would have to file a plan and make application to the licensing board. One Berstein testified that he was president of a finish company; that in October, 1942, he did some work at the Grove and delivered materials there; that in that month he saw Welansky at the Grove, and Welansky referred him to Bodenhorn; that Welansky said that he would need merchandise for the job, and that if anyone "ordered from the job," the witness "should deliver it" and the "Grove office would pay for it"; and that he told Bodenhorn that he had orders from Welansky to make the bar, and that Bodenhorn should give him the design, which Bodenhorn did. One Berenson, an advertising salesman for certain Boston newspapers, testified that for a period of four to six years he had dealt exclusively with Welansky on advertising matters connected with the Grove; that around November 9 or 10 he talked with Welansky at the Grove, at which time Welansky asked him to prepare advertising matter relative to a new room which was going to open; that the witness had proofs prepared which he sent to Welansky; and that as a result of a telephone talk with Welansky the advertisements appeared in the newspapers beginning November 16.

The evidence was ample that the defendant directed the change in the location of the toilet rooms. One Mazer, a carpenter, testified that he worked at the Grove from September 10 to November 10, and that his work included among other things building, under the defendant's orders, the partition between the toilets. It appeared from the testimony of one Baker, a bricklayer, that when he finished work on November 12 or 13, the toilets were in. There were in evidence statements made by the defendant after

the fire. These were rightly admitted only against the defendant. *Commonwealth* v. *Snyder,* 282 Mass. 401, 416. In such statements to the fire marshal or before the grand jury the defendant said that he was in the construction business and was a licensed builder; that he had been in business around Boston for thirty-seven years; that he first did work at the Grove "for the Welanskys" in 1935 or 1936; that he then had a permit, as any work over $5 required a permit; that in doing that work he conferred with Welansky; that he had done the work on the new cocktail lounge; that he hired the men from the union; that he had a plan, "we had to go according to the plan"; that Welansky was the first one to ask him to do the work; that Welansky asked him to "make two stores into one, to break through the walls, level up the floor, make partitions in the ladies' and men's toilets"; that the plan showed the toilets on the Shawmut Street wall; that they were not installed where the plan called for them but were installed where the plan was marked "passageway" at 4 Shawmut Street; that there was no passageway at the time of his statement; that a "passage to street," appearing on the plan, was blocked up during the work the defendant did; that the work on the new cocktail lounge left the place in a different condition from that indicated on the plan in that the toilets were not put in the right place, fire doors were not put in between the foyer and the lounge, and no fire doors were put in the passageway from 65 Broadway to 17 Piedmont Street; that the defendant changed the toilets around so that they were in a location different from that which the plan he was supposed to follow called for; that he made the change to improve the ventilation; that he knew that the law required permits for the alterations; and that he was on the premises once, twice or three times a week until immediately before the fire.

From the foregoing the jury could have inferred that the defendant, who signed all four applications for permits, and Welansky, who signed three of them and discussed with the architect the signing of the fourth, were aware of

the statute and by concerted action planned its violation. The Commonwealth did not have to prove that either knew the number of the chapter or the year of its passage. It is enough if they knew that a law required an approved plan for alterations to which they had to conform but with which by united action they did not comply. The defendant was a builder of many years' experience. He knew that the law required permits for the alterations, and that he "had to go according to the plan." He flagrantly flouted the plan in the location of the toilet rooms. Welansky could have been found throughout to have been "at the head and front of the whole enterprise." *Commonwealth* v. *Benesch*, 290 Mass. 125, 135. He could have been found to occupy that position from July or August, and not merely from September 22, when he was formally elected president, treasurer, and manager. He was the one who first went to the licensing board to make changes "in his licensed premises." He told the licensing board that he was the one who was "adding space in the buildings 59 and 65 Broadway." He was the one who went to the building department to obtain permits "to do the work in accordance with the plan," and received forms for the applications. He filed three of them. He directed the architect to make all changes the building department should prescribe. He gave orders for some of the work, arranged for the hiring of some of the workmen, ordered some of the materials and gave instructions for payment for them, and finally took charge of the advertising for the opening of the new cocktail lounge. The defendant was on the premises one to three times a week according to his own statement, and Welansky, who became manager of the Grove, could have been found to have been there sufficiently often to know that the passage to the street was being eliminated and that the toilet rooms were not in the course of being located according to the plan, with which he must have been familiar. It also could have been inferred that this most important change and obvious variation, made as the defendant stated "to improve the ventilation," could not have happened without the knowledge

and approval of Welansky, and that the defendant would not have thus disregarded the plan on his own responsibility but must have known that there was such knowledge and approval by Welansky. The defendant contends that there is no evidence that Welansky was even on the premises from the time when he told Feer to go to the building department to make the changes in the applications (which must have been not later than September 1) until November 9 or 10, when he saw Berenson, the advertising agent, at the Grove. It is sufficient answer to this contention that Tracey, the "handy man" and maintenance man, who worked at the Grove from May until the fire and who "moved into" the building at 4 Shawmut Street in September, received orders from Welansky until the latter became ill on November 16 (three or four days after the toilets were completed); and that in October Berstein did work and delivered materials at the Grove, and there saw Welansky, who discussed the delivery of materials and payment, and also referred him to Bodenhorn.

As hereinafter discussed, the defendant's contention, that there was no evidence of criminal intent because of an alleged custom in Boston to defer obtaining approval of changes in an approved plan for alterations until the completion of the work, is unsound. It was also open to the jury to find that the work was as far completed as contemplated at the time.

The motion for a directed verdict was properly denied.

2. What has been said disposes of the defendant's argument that there was error in the recording of the verdict on the ground that there was no evidence of any conspiracy between the defendant and Welansky.

3. We next consider the defendant's exceptions to the admission and exclusion of evidence.

(a) On cross-examination one Glover, chief clerk of the building department, called as a witness by the Commonwealth, was asked by Eldracher's counsel, "Whether or not . . . there was a practice in the department with reference to the doing of some work which might be a variance, and not a violation of the law, a variance from the plan or speci-

fications, as to the time when an application to amend the. plan might be filed?". The question was excluded, and the defendant excepted and adopted Eldracher's offer of proof. that the witness "would testify that when a variance was had in work actually done, between that set forth in the plan and specifications, on alterations, that the work need not be stopped, but that later on the owner might file an amendment to the plan and it would be granted in the usual course." On cross-examination one Curtin, an architect called as a witness by the Commonwealth, was asked by the defendant's counsel: "Now, isn't it the practice and custom in doing alterations to a building, where conditions are encountered requiring a variation from the plan, and where the doing of the variations is not of itself a violation of the building laws, for the person performing the alterations to proceed with the work, vary from the plan, provided that the variation is not a violation of the building laws, and before the job is closed to file with the building department of the city of Boston an application for amendment showing each and every variation or departure from the plan, and to file the same for approval?" The defendant offered to prove that the witness would reply, "Yes, and that would be the established practice," and offered to make a more lengthy offer of proof. The judge informed counsel that he did not have to do so and excluded the evidence. The defendant excepted. The testimony was properly excluded. It amounted to no more than to a custom to violate the statute which would be invalid. *Commonwealth* v. *Doane,* 1 Cush. 5, 9. *Conahan* v. *Fisher,* 233 Mass. 234, 239–242. *Nowell* v. *Equitable Trust Co.* 249 Mass. 585, 600. *King* v. *Gannon,* 261 Mass. 94. *Scola* v. *Scola, ante,* 1, 7. The judge's ruling that the defendant did not have to make an offer of proof was right. *Stevens* v. *William S. Howe Co.* 275 Mass. 398, 402. *McGeorge* v. *Grand Realty Trust, Inc.* 316 Mass. 373, 377. *Grandell* v. *Short,* 317 Mass. 605, 608–609.

(b) At the close of the evidence for the Commonwealth, subject to the defendant's exception, the judge allowed the Commonwealth's motion that all of its exhibits in the case

be admitted against each of the five defendants and that all of the acts and declarations of Welansky and of the five defendants made in pursuance of the alleged conspiracy be admitted against each of the five defendants, but instructed the jury that evidence of statements made by the defendants after the fire remained limited to the particular persons whose statements were introduced in evidence. The Commonwealth then rested as did all the defendants except James Welansky, who before resting his case called one witness whose testimony is not set forth in the bill of exceptions.

This exception must be overruled. The acts and declarations of Welansky are covered by what has been hereinbefore discussed. As to the three remaining defendants other than Bodenhorn, there was evidence that each was in a conspiracy to violate the building law as alleged in the indictment. As to James Welansky there was evidence that he was on the premises after the illness of his brother, Barnett Welansky, from November 16 until the fire; that he instructed Tracey to see that the new cocktail lounge was taken care of, and to do whatever his brother had told Tracey to do; that on November 17, previous to the opening that night, he took the alcoholic beverages license to the licensing board in order to obtain an extension to cover the three additional buildings, which were the subject of the "application or petition" previously filed with the board; that in response to a question by a clerk whether "the work called for on the petition was all completed according to Hoyle," he answered that it was; that the clerk ruled off the old description on the license, interlined the new description appearing on the petition, typewrote on the license that permission to change the license had been granted on August 26, obtained the signature of the chairman, and delivered the license to James Welansky; and that on November 16 and 22 Berenson had conversations with James Welansky at the Grove about newspaper advertising for the Grove. As to Gilbert there was evidence that he was the brother-in-law and a business associate of the defendant, and from the middle of August was

constantly on the premises in a supervisory capacity with respect to the alterations; that he hired workmen, with authority, in some cases at least, to fix the rate of pay; that he distributed pay envelopes to some workmen and took others to the Grove office to be paid; that he gave orders as to the doing of some of the work; that he ordered two fire doors; and that he was also the timekeeper on the job. As to Eldracher, there was evidence that he had been an inspector in the building department of the city for over twenty-five years, and that the Grove was in his district in 1942; that in accordance with the practice of the department he was given the synopsis of the altera- tions; that it was his duty to keep the synopsis until the work was completed; that he made sixteen reports of the progress of the work, the first being dated August 28 and the others bearing various dates from September 15 to November 25 (he being on vacation from August 29 to September 14); that at no time did he call attention to any violation of the law, although there was a department form for the purpose;[1] that he was on the premises the day the new cocktail lounge was opened; and that he had not made any final report of the work. It is provided in St. 1907, c. 550, § 1, "The commissioner may require plans and specifications . . . for the alteration of any structure or building to be filed with him, duplicates of which, when approved by the commissioner, shall be kept at the build- ing during the progress of the work." Such a plan was approved by the building commissioner on September 1, and it could have been inferred that it was still on the premises at the time of the fire. From all this it could have been inferred that each of the defendants James Welansky, Gilbert, and Eldracher was familiar with the plan and with its actual or intended violation. The same conclusion could have been reached as to James Welansky from his state- ment to the clerk of the licensing board that the work had been completed "according to Hoyle," as to Gilbert from his position with respect to the work, and as to Eldracher

[1] See St. 1907, c. 550, § 2.

from his official position alone. See *Vogel* v. *Brown,* 201
Mass. 261, 263. It also could have been found that each
of the three acted to violate the law in combination with
one or more of the defendants (except Bodenhorn) and
Welansky. *Commonwealth* v. *Smith,* 163 Mass. 411.

As to Bodenhorn, a different situation is presented.
While the jury were fully instructed on the law of con-
spiracy and were repeatedly told in the charge that Boden-
horn was not a conspirator, the judge did not at any time
instruct them that Bodenhorn's acts and declarations could
not be considered against the defendant. The defendant
was not prejudiced, however, as the evidence as to the acts
and declarations of Bodenhorn was harmless. There was
testimony, aside from that admitted solely to affect the
credibility of the witness Berstein referred to below, that
the plan prepared by Feer was based on a layout sketch
made by Bodenhorn. This added little to the statements
of the defendant admitted in evidence to the effect that
Bodenhorn was the decorator and "the brains" of the
Grove job; that the defendant always took his orders from
Bodenhorn and never did any work that Bodenhorn did
not supervise; that Bodenhorn was at the Grove in 1935
and 1936 when the defendant did other work there, and
that one had to do everything that Bodenhorn told him;
and that in 1942 so far as authority was concerned, Boden-
horn was first, Gilbert second, and the defendant third.
There was also testimony from Berstein as to talks with
Bodenhorn about fire doors, but its probative force was to
tend to show an effort to follow the plan and to comply
with the law in this respect.

(c) Certain evidence was admitted from witnesses called
by the Commonwealth to contradict the witness Berstein.
After identifying one Spector, who had testified that he
was in the roofing business under the name of Common-
wealth Roofing Company, Berstein testified that he did
not ask Spector for metal for fire doors. Asked whether
he told the grand jury on May 17, 1943, that he had ordered
or tried to get metal for fire doors from Spector, he testified
that "maybe" he had so told the grand jury; and that he

knew Spector did business under the name of Commonwealth Roofing Company. Upon being shown his grand jury testimony the witness testified that in it he had said that he had tried to get the metal from the Commonwealth Roofing Company; that he did not remember whether he asked Spector for metal; that if he told the grand jury he had tried to get it from Spector, then he had tried; and that his answer was not that he had never tried to get it from Spector. Spector was later recalled by the Commonwealth and, subject to the defendant's exception, solely to impeach Berstein's credibility, was allowed to testify that Berstein did not ask him in the fall of 1942 for any metal or if he could sell Berstein any metal. The testimony was properly admitted. While Berstein at first testified to the contrary, he finally adhered to the statement that if he had told the grand jury he had tried to get metal from Spector, "then he had tried," and that his answer was not in the negative. *Sullivan* v. *Boston Elevated Railway*, 224 Mass. 405, 406.

On direct examination Berstein testified that he talked with Bodenhorn two or three times in October, 1942, about the layout of the bar; that these talks had to do with the bar; that later he talked with Bodenhorn about fire doors; that this was eight or nine days before the fire; that this talk was in the cocktail lounge, which was not then finished; that Bodenhorn gave him the sizes for the doors; that he talked with chief inspector Murphy of the State police; that he told the grand jury on May 18, 1943, that he told Murphy that the last time he talked with Bodenhorn or anyone about fire doors was before the cocktail lounge was opened; that he saw Bodenhorn twice about fire doors, the first time being when Bodenhorn gave him the sizes, and the second and last time being several days before the cocktail lounge was opened; that he told Bodenhorn he could not get the metal for the doors; that the last time he talked with Bodenhorn about fire doors was four, five, or six days before the fire; that he did not tell Murphy on May 11, 1943, that the last talk he had with anyone about fire doors was several days before the cocktail lounge was opened for

business; that he tried to get metal for fire doors from others, including National Fire Proofing Doors and one Pinks who said that a priority would be necessary; and that he brought his records to the grand jury, that there was no record of anything connected with fire doors, that he had no such record, that he did not have the paper on which Bodenhorn's instructions about fire doors had been written, as he had thrown it away. The Commonwealth then called Murphy as a witness, who testified that he talked with Berstein on May 11, 1943, at his place of business, and that Berstein showed him some records of his company's business with the Grove. Subject to the defendant's exception the witness testified that Berstein told him that he had no record of any orders for fire doors. Also subject to the defendant's objection and exception the judge for the purpose of impeaching the credibility of Berstein admitted the conversation which the witness had with him to the effect that Berstein said that the defendant had told Berstein that there was work from Welansky at the Grove, that Berstein did considerable work at the Grove, and had talked there with Bodenhorn, who told him that fire doors were required by law. The witness further testified that Berstein at that time said that he had made the doors for the toilets, and talked with Bodenhorn about fire doors several days before the opening of the cocktail lounge; that Berstein said he did not recall whether at the time of that talk with Bodenhorn he was making the fire doors or trying to obtain priority; and that Berstein at that time told him that was the last talk he had with Bodenhorn.

No error is shown. The testimony as to the absence of any record of orders for fire doors is no more than cumulative. The admission or exclusion of such evidence rarely constitutes prejudicial error. *Commonwealth* v. *Capalbo*, 308 Mass. 376, 383. *Commonwealth* v. *Mannos*, 311 Mass. 94, 115. The remaining testimony was expressly admitted solely to impeach the testimony of the witness Berstein. This was proper. *Dunlea* v. *R. D. A. Realty Co.* 301 Mass. 505, 506. *Commonwealth* v. *Cohan*, 307 Mass. 179, 182–183. G. L. (Ter. Ed.) c. 233, § 23. It is to be assumed that the jury

followed the ruling of the judge as to the limited purpose of its admission. *Commonwealth* v. *Ham*, 150 Mass. 122, 124. *Commonwealth* v. *Morrison*, 252 Mass. 116, 125. The testimony of Berstein itself was contradictory and confusing, and was by no means clear even as to the number of conversations with Bodenhorn wholly aside from their dates. The statement that the defendant said that there was work from Welansky at the Grove, and the statement that Berstein did considerable work at the Grove were admissible as part of an effort to identify the disputed time of the conversation with Bodenhorn, and could not have been other than harmless to the defendant upon whom rests the burden to show error. *Commonwealth* v. *Min Sing*, 202 Mass. 121, 130. *Commonwealth* v. *McIntosh*, 259 Mass. 388, 391. *Commonwealth* v. *Mannos*, 311 Mass. 94, 115. The statement attributed to Bodenhorn that the fire doors were required by law appears as part of the same conversation between Berstein and Murphy, and on the record must have been in response to the same question. The exception must be taken to have been to the question asking for "the conversation" as a whole. See *Commonwealth* v. *Zaidon*, 253 Mass. 600, 602. If the defendant desired to object to a part of the answer, he should have done so by motion to strike out. *Cashin* v. *New York, New Haven & Hartford Railroad*, 185 Mass. 543, 545–546. *Commonwealth* v. *Anderson*, 220 Mass. 142, 145. *Commonwealth* v. *Powers*, 294 Mass. 59, 61.

(d) The defendant states in his brief that his other exceptions to rulings on evidence, over eighty in number, are not waived. We have considered herein all that have been argued. *Commonwealth* v. *Dyer*, 243 Mass. 472, 508. *Commonwealth* v. *Gale*, 317 Mass. 274, 276.

4. There was no error in the denial of the defendant's requests for instructions. We consider such exceptions as have been argued. Requests numbered 11 and 12 could not have been granted. The plan as approved called for openings different from those made and showed fire doors as well. Request numbered 14 is based on an inaccurate interpretation of the plumbing permit. Requests numbered

15 and 16, relating to the easterly wall of 17 Piedmont Street, and request numbered 17, relating to the westerly wall of 65 Broadway, are based upon the erroneous assumption that neither could be found to be a party wall, which is defined in St. 1907, c. 550, § 11, as "A wall that separates two or more buildings, and is used or adapted for the use of more than one building." The jury were properly instructed in this respect. There was evidence from which it could be found that these walls were used for more than one building. There is nothing in St. 1907, c. 550, § 23, as amended by Spec. St. 1918, c. 179, § 11, which requires a different conclusion.

5. The defendant's exception to the denial of his motion for a new trial must be overruled. The motion was addressed to the discretion of the judge. *Commonwealth* v. *Venuti*, 315 Mass. 255, 261. No abuse of discretion appears. The defendant argues his exceptions to the denial of two requests for rulings in substance that upon "the issue raised by the motion . . . whether the verdict was against the evidence or the weight of the evidence," the judge could not consider, or must disregard, "the evidence admitted in the first place against defendants who have been acquitted and subsequently admitted against all defendants at the trial." No error is shown. The acquittal of the other defendants may have been due to failure to find any criminal intent on their part. It does not follow, however, that the same evidence was not to be considered or must be disregarded as to the defendant, who, the jury under the instructions must have found, did have such intent.

*Exceptions overruled.*