**UNITED STATES of America**

v.

**John D. EHRLICHMAN et al.**

**Crim. No. 74–116.**

United States District Court,
District of Columbia.

May 24, 1974.

See also, D.C., 379 F.Supp. 291.

William S. Frates, Andrew C. Hall, Miami, Fla., Spencer H. Boyer, Henry H. Jones, Washington, D. C.. for John D. Ehrlichman.

David I. Shapiro, Sidney Dickstein, Kenneth L. Adams, Washington, D. C., for Charles W. Colson.

Peter L. Maroulis, Poughkeepsie, N. Y., for G. Gordon Liddy.

Daniel E. Schultz, Washington, D. C., for Bernard L. Barker and Eugenio R. Martinez.

William H. Merrill, Associate Special Pros., Charles Breyer, Philip Bakes, Philip Heymann, David Kaye, Robert Palmer, Asst. Special Prsecutors, Washington, D. C., for the United States.

## MEMORANDUM AND ORDER

GESELL, District Judge.

■ Five defendants stand indicted for conspiring to injure a Los Angeles psychiatrist in the enjoyment of his Fourth Amendment rights by entering his offices without a warrant for the purpose of obtaining the doctor's medical records relating to one of his patients, a Daniel Ellsberg, then under Federal indictment for revealing top secret documents. They now claim that broad pre-trial discovery into the alleged national security aspects of this case is essential to the presentation of their defense, in that it will establish (1) that the break-in was legal under the Fourth Amendment because the President authorized it for reasons of national security, and (2) that even in the absence of such authorization the national security information available to the defendants at that time led them to the good-faith, reasonable belief that the break-in was legal and justified in the national interest. The Court has carefully considered these assertions, which have been fully briefed and argued over a two-day period, and

finds them to be unpersuasive as a matter of law.[1]

■ In approaching these issues, it is well to recall the origins of the Fourth Amendment and the crucial role that it has played in the development of our constitutional democracy. That Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment protects the privacy of citizens against unreasonable and unrestrained intrusion by Government officials and their agents. It is not theoretical. It lies at the heart of our free society. As the Supreme Court recently remarked, "no right is held more sacred." Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed. 2d 889 (1968), quoting from Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). Indeed, the American Revolution was sparked in part by the complaints of the colonists against the issuance of writs of assistance, pursuant to which the King's revenue officers conducted unrestricted, indiscriminate searches of persons and homes to uncover contraband. James Otis' famous argument in *Lechmere's Case,* challenging the writ as a "monster of oppression" and a "remnant of Star Chamber tyranny,"[2] sowed one of the seeds of the coming rebellion. The Fourth Amendment was framed against this background; and every state in the Union, by its own constitution, has since reinforced the protections and the security which that Amendment was designed to achieve.

Thus the security of one's privacy against arbitrary intrusion by governmental authorities has proven essential to our concept of ordered liberty. When officials have attempted to justify law enforcement methods that ignore the strictures of this Amendment on grounds of necessity, such excuses have proven fruitless, for the Constitution brands such conduct as lawless, irrespective of the end to be served. Throughout the years the Supreme Court of the United States, regardless of changes in its composition or contemporary issues, has steadfastly applied the Amendment to protect a citizen against the warrantless invasion of his home or office, except under carefully delineated emergency circumstances. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). No right so fundamental should now, after the long struggle against governmental trespass, be diluted to accommodate conduct of the very type the Amendment was designed to outlaw.

■ The break-in charged in this indictment involved an unauthorized entry and search by agents of the Executive branch of the Federal Government. It is undisputed that no warrant was obtained and no Magistrate gave his approval. Moreover, none of the traditional exceptions to the warrant requirement are claimed and none existed; however desirable the break-in may have appeared

---

1. The Court also rejects the claim that this indictment must be dismissed because the judiciary has no right to risk the public disclosure of the sensitive national security information required for the prosecution and defense of the case. Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875), cited by defendants, is inapplicable to criminal actions and has been modified by a century of legal experience, which teaches that the courts have broad authority to inquire into national security matters so long as proper safeguards are applied to avoid unwarranted disclosures. Nixon v. Sirica, 487 F.2d 700, 713 (D.C. Cir. 1973). *See also* United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

2. Otis' argument was abstracted by John Adams. *See* Legal Papers of John Adams 134–44.

to its instigators, there is no indication that it had to be carried out quickly, before a warrant could have been obtained. On the contrary, it had been meticulously planned over a period of more than a month. The search of Dr. Fielding's office was therefore clearly illegal under the unambiguous mandate of the Fourth Amendment. *See* Wolf v. People, 117 Colo. 279, 187 P.2d 926 (1947), aff'd sub nom., Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

■ ■ Defendants contend that even though the Fourth Amendment would ordinarily prohibit break-ins of this nature, the President has the authority, by reason of his special responsibilities over foreign relations and national defense, to suspend its requirements, and that he did so in this case. Neither assertion is accurate. Many of the landmark Fourth Amendment cases in this country and in England concerned citizens accused of disloyal or treasonous conduct, for history teaches that such suspicions foster attitudes within a government that generate conduct inimical to individual rights. *See* United States v. United States District Court, 407 U.S. 297, 314, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). The judicial response to such Executive overreaching has been consistent and emphatic: the Government must comply with the strict constitutional and statutory limitations on trespassory searches and arrests even when known foreign agents are involved. *See, e. g.,* Abel v. United States, 362 U.S. 217, 226,

80 S.Ct. 683, 4 L.Ed.2d 668 (1960); United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952). To hold otherwise, except under the most exigent circumstances, would be to abandon the Fourth Amendment to the whim of the Executive in total disregard of the Amendment's history and purpose.

■ Defendants contend that, over the last few years, the courts have begun to carve out an exception to this traditional rule for purely intelligence-gathering searches deemed necessary for the conduct of foreign affairs. However, the cases cited are carefully limited to the issue of wiretapping, a relatively nonintrusive search, United States v. Butenko, 494 F.2d 593 (3d Cir. 1974); United States v. Brown, 484 F.2d 418 (5th Cir. 1973); Zweibon v. Mitchell, 363 F.Supp. 936 (D.D.C.1973), and the Supreme Court has reserved judgment in this unsettled area. United States v. United States District Court, 407 U.S. 297, 322 n. 20, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).[3] The Court cannot find that this recent, controversial judicial response to the special problem of national security wiretaps indicates an intention to obviate the entire Fourth Amendment whenever the President determines that an American citizen, personally innocent of wrongdoing, has in his possession information that may touch upon foreign policy concerns.[4] Such a doctrine, even in the context of purely information-gathering searches,

3. While the Fourth Amendment undoubtedly encompasses nontrespassory surveillance, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. . . ." United States v. United States District Court, *supra*, at 313.

4. The doctrine of the President's inherent authority as "the sole organ of the nation in its external relations," 10 Annals of Cong. 613 (1800) (remarks of John Marshall), has been developed by a series of Supreme Court decisions dealing with the President's power to enter into international agreements and to prohibit commercial contracts which impede American foreign policy. Chicago & So. Air

Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). None of these cases purport to deal with the constitutional rights of American citizens or with Presidential action in defiance of congressional legislation. When such issues have arisen, Executive assertions of inherent authority have been soundly rejected. *See* Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

would give the Executive a blank check to disregard the very heart and core of the Fourth Amendment and the vital privacy interests that it protects. Warrantless criminal investigatory searches —which this break-in may also have been [5]—would, in addition, undermine vital Fifth and Sixth Amendment rights.

██ ██ The facts presented pretrial lead the Court to conclude as a matter of law that the President not only lacked the authority to authorize the Fielding break-in but also that he did not in fact give any specific directive permitting national security break-ins, let alone this particular intrusion. The President has repeatedly and publicly denied prior knowledge or authorization of the Fielding break-in, and the available transcripts of the confidential tape recordings support that claim.[6] No defendant has presented any evidence to the contrary, and neither Ehrlichman nor Colson, the two defendants who had the greatest access to the President, contend that such specific authorization was given to anyone. The Special Prosecutor has uncovered nothing to the contrary. Although there is no recording of the crucial San Clemente meeting between the President, Ehrlichman and Krogh, their similar accounts of that conversation reflect intense Presidential concern with the need to plug the national security leaks and a belief that Dr. Ellsberg might be involved, but no specific reference either to Dr. Fielding or to trespassory searches. The President described that meeting in the following terms:

I considered the problem of such disclosures most critical to the national security of the United States and it was my intent, which I believe I conveyed, that the fullest authority of the President under the Constitution and the law should be used if necessary to bring a halt to these disclosures. I considered the successful prosecution of anyone responsible for such unauthorized disclosures a necessary part of bringing to an end this dangerous practice of making such unauthorized disclosures.

I did not have prior knowledge of the break-in of Dr. Fielding's office, nor was I informed of it until March 17, 1973.[7]

Such comments simply cannot be interpreted to direct a break-in in violation of the Fourth Amendment.

██ Defendants adopt the fall-back position that even if the President did not specifically authorize the Fielding break-in, he properly delegated to one or more of the defendants or unindicted co-conspirators the authority to approve national security break-ins. Of course, since the President had no such authority in the first place, he could not have delegated it to others. Beyond this, however, the Court rejects the contention that the President could delegate his alleged power to suspend constitutional rights to non-law enforcement officers in the vague, informal, inexact terms noted above. Even in the wiretap cases the courts have stressed the fact that the President had specifically delegated the authority over "national security" wiretaps to his chief legal officer, the Attorney General, who approved each such tap. *See, e. g.,* Katz v. United States, 389 U.S. 347, 364, 88 S.Ct. 507, 19 L.Ed.

5. This possibility is strongly suggested by that portion of the President's letter to the Court set forth at p. 34, *infra.*

6. The President has called the break-in "illegal, unauthorized, as far as I am concerned, and completely deplorable" (Presidential news conference, August 22, 1973), and has repeatedly insisted that he gave no approval and had no prior knowledge of that incident (*see, e. g.,* President's letter to the Court, *infra,* p. 34; President's Statements of May 22, 1973, and

August 15, 1973). On March 21, 1973, while discussing the break-in long after the fact, the President stated, "I don't know what the hell we did that for," and the possibility of claiming a national security justification was thereafter considered (Tape Transcript of March 21, 1973, meeting between the President, John Dean and H. R. Haldeman).

7. Letter to the Court from President Richard M. Nixon, dated April 29, 1974.

2d 576 (1967) (White, J., concurring). *Cf.* United States v. Chavez, —— U.S. ——, 94 S.Ct. 1849, 40 L.Ed.2d 380, 42 U.S.L.W. 4660 (1974). Whatever accommodation is required between the guarantees of the Fourth Amendment and the conduct of foreign affairs, it cannot justify a casual, ill-defined assignment to White House aides and part-time employees granting them an uncontrolled discretion to select, enter and search the homes and offices of innocent American citizens without a warrant. *Cf.* Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Ex parte Merryman, 17 Fed. Cas. p. 144, 151 (No. 9,487) (C.C.Md. 1861).

■■■ Defendants contend that, even if the break-in was illegal, they lacked the specific intent necessary to violate section 241 because they reasonably *believed* that they had been authorized to enter and search Dr. Fielding's office. As explained above, however, such authorization was not only factually absent but also legally insufficient, and it is well established that a mistake of law is no defense in a conspiracy case to the knowing performance of acts which, like the unauthorized entry and search at issue here, are *malum in se*. *See, e. g.*, Hamburg-American Steam Packet Co. v. United States, 250 F. 747, 758–759 (2d Cir.), cert. denied, 246 U.S. 662, 38 S.Ct. 333, 62 L.Ed. 927 (1918); Chadwick v. United States, 141 F. 225, 243 (6th Cir. 1905); United States v. DePietro, 36 F.Supp. 389 (W.D.N.Y. 1941); Commonwealth v. O'Rourke, 311 Mass. 213, 40 N.E.2d 883, 887 (1942); People v. McLaughlin, 111 Cal.App.2d 781, 245 P.2d 1076 (1952); G. Williams, Criminal Law 288 n. 4 (2d ed. 1961). As the Supreme Court said in Screws v. United States, 325 U.S. 91, 106, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945), "[t]he fact that the defendants may not have been thinking in constitutional terms is not material [to a charge under § 242, a related specific intent statute,] where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitu-

tion." Here, defendants are alleged to have intended to search Dr. Fielding's office without a warrant, and their mistaken belief that such conduct did not offend the Constitution would not protect them from prosecution under section 241. *See also* Williams v. United States, 341 U.S. 97, 101–102, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

■■■ The cases cited by the defendants are not to the contrary. United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), requires only that the acts which violate federal rights must have been the primary purpose of the conspiracy rather than an incidental side effect. And United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933), merely reflects the rule that mistake of law often *is* a defense to *malum prohibitum* crimes requiring specific intent, such as those created by the federal tax laws. *See also* Commonwealth v. Rudnick, 318 Mass. 45, 60 N.E.2d 353 (1945). *But see* Chadwick v. United States, *supra*, at 243.

■■■ Mistake of law may also excuse an act if it resulted from good faith reliance upon a court order or decision, United States v. Mancuso, 139 F.2d 90 (3d Cir. 1943); State v. O'Neil, 147 Iowa 513, 126 N.W. 454 (1910), or upon the legal advice of an executive officer charged with interpreting or enforcing the law in question. *See* Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed. 2d 487 (1965); Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). This principle however, cannot be stretched to encompass a mistake based upon the assurances of an alleged co-conspirator with regard to the criminality of acts that are *malum in se*. *See* United States v. Konovsky, 202 F.2d 721, 730–731 (7th Cir. 1953) (obedience to the orders of a superior does not necessarily negate the specific intent requirement set forth in *Screws*).

■■■ Defendants nonetheless are entitled to present factual material that negatives the claim that they conspired to break in. This will, of course, permit

them to explain contacts and activities which may imply collaboration as to the break-in but which they contend was collaboration in pursuit of different, more legitimate efforts to tighten security and prevent leaks within the Government establishment. This material, of course, will necessarily also reflect upon the underlying questions of intent and apparently will require the presentation of some evidence bearing on the defendant's knowledge and authority in national security areas. Discovery to this end— within strict limits—should be permitted by specific, particularized documentary discovery adequate to corroborate their factual contentions as to the legitimate reasons for their association.

To the extent that the Special Prosecutor has not already produced all material relevant to these limited issues within the possession of his office, the Department of Justice and the F.B.I., defendants may demand such production under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Rule 16 of the Federal Rules of Criminal Procedure. Defendants may pursue such material in the possession of other government agencies or private parties by means of tightly framed subpoenas *duces tecum*, in accordance with Rule 17 of the Federal Rules of Criminal Procedure. These subpoenas must be confined to documents the defendants wrote, received, or read, and a strict rule of relevance and materiality will be applied. Cumulative material will be rejected. These subpoenas should give adequate notice and be returnable in open court on June 6, 1974, at 9:30 a. m. At that time the Court will hear any objections and make rulings, document-by-document, following such *in camera* inspection as may be necessary. All documents subpoenaed shall be produced in court.

Defendants, while expressing some willingness to go along with this procedure, claim that the Special Prosecutor is required by *Brady* to obtain all of this material himself and disclose it to the defendants. Although the issue is unsettled, there is some support for the contention that the prosecutor's duty of production under *Brady* applies not only to documents in the possession of any federal investigative agency, United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642, 650 (1971), but also to those held by any agency closely connected to the allegations in the indictment. United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973). While this rule would undoubtedly be reasonable in most federal prosecutions, it cannot be applied to the instant case. Here the Government is prosecuting itself, and those in the Government who have evidence needed by the defense are in an adversary position toward the Special Prosecutor and perhaps in some instance toward the defendants as well. Under such circumstances, in which the customary informal requests within the Government would be to no avail, the subpoena approach set forth above best serves the purposes of *Brady* by providing a prompt, orderly and enforceable procedure for obtaining the necessary disclosures prior to trial.

While the Court is thus limiting the Prosecutor's duty to demand exculpatory evidence from other government agencies, it is not limiting the Government's ultimate duty to produce such material: if evidence relevant and material to the defense is suppressed despite a sufficiently specific demand from one of the defendants, the Court will use the full range of its sanctions, including dismissal, if necessary, to insure that defendants received a fair trial. *See* United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); United States v. Andolschek, 142 F.2d 503 (2d Cir. 1944).

Defendants' motions for discovery are granted to the extent set forth above and are denied in all other respects. The motion for dismissal because of the danger of exposing national security information is denied.

So ordered.