COMMONWEALTH *vs.* MICHAEL VINCENT GEAGAN & others (and twelve companion cases[1]).

Suffolk. February 11, 1959. — July 1, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, & CUTTER, JJ.

*Practice, Criminal,* Grand jury proceedings; Fair trial; Examination of jurors; Abatement; Time of trial; Trial of indictments together; Mistrial; Exceptions: whether error harmful, failure to save exception; Striking out evidence; Opening by district attorney; Argument by district attorney. *Grand Jury. Constitutional Law,* Due process of law. *Jury and Jurors. Pleading, Criminal,* Motion to quash, Plea in bar, Plea in abatement. *Law or Fact. Error,* Whether error harmful. *Evidence,* Corroborative evidence, Accomplice, Relevancy and materiality, On cross-examination, Consciousness of guilt, Admitted without objection, Scope of evidence admitted, Admissions and confessions, Stated ground of objection. *Accessory.*

A motion to quash an indictment was not properly grounded on matter other than a formal defect apparent on the face of the indictment and was properly denied. [495]

That a grand jury returning an indictment had been prejudiced against the defendant by widely publicized and prejudicial news releases and statements by law enforcement officials, that unauthorized persons had been present in the grand jury room, that the secrecy of the grand jury proceeding had been violated by revelation of the testimony of witnesses before it, and that the defendant would be unable to secure a fair and speedy trial because of such releases and statements were not proper grounds of a plea in bar to the indictment. [495]

There was no error in a criminal case in a refusal to require the Commonwealth to file a demurrer or a replication to a plea in abatement filed by the defendant to the indictment. [496]

[1] Of the companion cases two are entitled Commonwealth *vs.* Michael Vincent Geagan & others, and ten are entitled Commonwealth *vs.* Joseph F. McGinnis.

Although the presence of unauthorized persons in a grand jury room during its deliberations was a valid ground in law of a plea in abatement to an indictment returned by it, on the record there was no error in a denial of a plea so grounded, not by reason of a determination of the matter as one of fact by the judge against a claim for trial by jury thereof by the defendant, but because there was nothing in an affidavit made by counsel, and no evidence offered, supporting the alleged ground.  [496]

That law enforcement officials issued news releases and statements disclosing what witnesses summoned before a grand jury had testified or would testify would not be sufficient reason for abating an indictment returned by the grand jury.  [497]

No violation of art. 12 of the Declaration of Rights of the Massachusetts Constitution or of the Fourteenth Amendment to the Federal Constitution through the return of indictments growing out of a notorious robbery, nor sufficient reason for abating the indictments, was shown by allegations that the grand jury had been prejudiced against the defendants by widely and "sensational[ly]" publicized news releases and statements by Federal and State law enforcement officials setting forth detailed particulars of the robbery, asserting that it was planned and committed by the defendants, and implicating them in other crimes.  [498–499]

The defendants in indictments growing out of a notorious robbery were not to be released, nor the indictments abated, on the ground that the defendants could never obtain both a fair and a speedy trial by reason of alleged widely publicized and prejudicial news releases and statements by law enforcement officials concerning the robbery and participation by the defendants therein and in other crimes.  [500–501]

Abuse of discretion by an order made early in June setting a date early in August for trial of indictments growing out of a notorious robbery was not shown by alleged widely publicized and prejudicial news releases and statements made in the preceding January and February by law enforcement officials concerning the robbery and participation by the defendants therein and in other crimes.  [501–502]

Following return of a number of indictments against several defendants for various offences, including conspiracy to steal, growing out of a robbery, there was no abuse of discretion in putting the defendants on trial on the conspiracy indictments along with the other indictments.  [502]

At the trial of indictments growing out of a notorious robbery, at which the judge in the selection of the jury put the statutory and other questions to the prospective jurors, alleged widespread and prejudicial publicity given the case through news releases and statements by law enforcement officials did not show abuse of discretion in refusing to put to the prospective jurors further questions suggested by the defendants as to whether they had read any newspaper or magazine articles concerning the case and what they had "read or heard" about specific features of the case.  [503–504]

There was no error at a criminal trial in declaring indifferent and seating

a prospective juror who stated that he did not "have a firm opinion" as to the guilt or innocence of the defendants or a prospective juror who stated that he had "a tentative opinion . . . [which] could be changed" where both further stated in effect that they thought they could take and adhere to the oath to try the issues "according to the evidence" "uninfluenced by any preconceived notion." [505–507]

Where, after partial selection of the jury at the trial of a criminal case, a juror who had been accepted and sworn and segregated with the other selected jurors revealed to the judge that he had an opinion about the case, it was proper for the judge to excuse him as a juror and there was no abuse of discretion in denial of motions then made by the defendant for a mistrial and that the judge interrogate the other selected jurors concerning any discussion of the case between them and the excused juror. [507–508]

At a criminal trial, certain evidence was admissible as showing the attending circumstances of the crime and was not, as contended by the defendant, objectionable as merely corroborating testimony for the Commonwealth of an accomplice on a collateral point not material to the defendant's guilt. [508]

At the trial of indictments against several defendants growing out of a robbery, testimony by an accomplice in the robbery, a witness for the Commonwealth, admitted generally, as to a certain conversation which he had had with one of the defendants was admissible as showing the disposition of money stolen in the robbery. [509]

No reversible error was shown at the trial of indictments against several defendants in the admission generally of testimony by a witness for the Commonwealth as to a conversation with one of the defendants, where the judge in his charge limited the admissibility of such testimony to that defendant. [509]

At the trial of an indictment, a colloquy respecting a question asked in cross-examination of a witness for the Commonwealth showed that the judge merely required, before allowing the question, that the defendant's counsel give his word that he would "connect . . . up" the subject matter of the question and did not require that counsel then produce "credible [connecting] evidence," and no error was shown in finally excluding the question. [509–510]

No error was shown at the trial of an indictment in the exclusion of certain evidence offered by the defendant where the purpose of the offered evidence was not stated to the judge. [510]

At the trial of indictments growing out of a robbery, there was on the record no error in the exclusion of certain newspapers offered by the defendants to show that an alleged accomplice who was a witness for the Commonwealth could have become familiar with the scene of the robbery from information contained in the newspapers. [511]

Reversible error was not shown at the trial of indictments growing out of a robbery in the exclusion of certain testimony as to the witness's driving over the route supposed to have been taken by the participants in the robbery in leaving the scene thereof. [511]

Commonwealth *v.* Geagan.

Certain evidence of flight, hiding or disguise on the part of the defendant in an indictment was admissible at his trial to show consciousness of guilt even though the act for which he was indicted would also constitute a Federal crime. [511–512]

The defendant at the trial of an indictment was not harmed by the exclusion of the record of a Federal proceeding wherein he was charged with travelling in interstate commerce "with intent to avoid prosecution for the crime" charged in the indictment. [512–513]

The question of the admissibility of evidence admitted without objection at a criminal trial cannot be raised as of right by a subsequent motion to strike out such evidence. [513]

At the trial of indictments against several defendants, a statement by the judge during the testimony of a witness as to a certain interrogation of one of the defendants, that in order to avoid the necessity of objections in behalf of the other defendants anything which such interrogated defendant was alleged to have said was admissible against him, was not a ruling that testimony as to anything that defendant said at other times and places and in other circumstances would be admissible. [514]

The defendant in a criminal case, after having stated at the trial a specific ground of objection to evidence offered by the Commonwealth, was not entitled to urge in this court other grounds for excluding the evidence. [515]

At a criminal trial where both the judge and the district attorney told the jury that statements by the district attorney in his opening were not evidence, there was no error in failing to instruct the jury that certain statements in that opening which the defendant claimed had not been borne out by the evidence must be disregarded. [515]

Where the judge at a criminal trial denied a request by the defendant that he instruct the jury to disregard certain portions of the district attorney's closing argument, and saved an exception to the denial, it was unnecessary to the validity of the exception that it be renewed at the close of the charge. [515–516]

On the record of the trial of indictments growing out of a notorious robbery, there was no impropriety in certain references to the Federal Bureau of Investigation made by the district attorney in his closing argument, no error in a refusal by the judge to instruct the jury specifically concerning certain matters touched on by the district attorney in his closing argument, and no error with respect to the district attorney's reading to the jury an excerpt from this court's opinion in a leading criminal case during his closing argument. [516–518]

One becomes an accessory before the fact to a crime, not "on the date on which . . . [he] last incites, procures, aids, counsels, hires, and commands the principal to commit" the crime, but upon its commission by the principal. [518–519]

INDICTMENTS found and returned on January 13, 1956, and January 16, 1956.

In the Superior Court, motions and pleas were heard by *Forte*, J., and the indictments were tried before him.

*Paul T. Smith, Manuel Katz, Robert J. DeGiacomo, & Lawrence F. O'Donnell,* (*Nicholas E. Liontakis, Melvin S. Louison, & Henry Sontag* with them,) for the defendants.

*John F. McAuliffe,* Assistant District Attorney, (*Gerald F. Muldoon,* Assistant District Attorney, *Donald P. Brennan, George F. Hurley, & John P. White* with him,) for the Commonwealth.

WILKINS, C.J. On January 17, 1950, there was a robbery at 165 Prince Street, Boston, the premises of Brink's, Incorporated, a company engaged in the transportation of money and valuables. The amount taken was $1,219,000. Eight defendants have been convicted on various indictments growing out of that robbery, and bring these cases here on appeals pursuant to G. L. c. 278, §§ 33A–33G, as amended, which are accompanied by a summary of the record, a transcript of the evidence, and their respective assignments of error.

The eight defendants are Geagan, McGinnis, Faherty, Pino, Richardson, Maffie, Costa, and Baker. Case number 99 is an indictment in three counts for robbery while armed against these eight, one Gusciora and one Banfield (both deceased before trial), and one O'Keefe (who pleaded guilty to that indictment and testified for the Commonwealth). The indictment in case number 100 charges the same persons with breaking and entering in the nighttime with intent to commit robbery. In these two cases a verdict of not guilty was directed for McGinnis, and the other seven defendants were convicted. All eight defendants were convicted on the indictment in case number 101, charging conspiracy to steal. McGinnis also was convicted in ten cases against him alone: case number 145, an indictment charging him with receiving stolen goods; case number 147, an indictment in ten counts, charging him with being an accessory before the fact to breaking and entering in the nighttime with intent to commit a felony; and cases number 148 to 153, inclusive, 156, and 157, eight indictments, each

in three counts, charging him with being an accessory before the fact to armed robbery.

There were returned many more indictments than the number tried. In the defendants' brief the total is given as 158 indictments, containing 496 counts. To these the defendants filed a large number of special pleadings, much too extensive helpfully to be set forth at length. It will be convenient to describe them as summarized in the defendants' brief. Each defendant filed to each indictment in which he was named as a defendant a motion to quash, a plea in abatement, and a plea in bar, and in support of each an affidavit to which there were seven exhibits. Each special pleading concluded with prayers that the Commonwealth be ordered to file a replication "or other answer"; that thereafter the special pleading be set down for hearing; and that the indictment be barred, abated, or quashed, as the case might be. Each defendant claimed a trial by jury on factual issues which he contended were raised by grounds 1, 2, 3, and 6 of each special pleading and its accompanying affidavit. All issues presently material were sought to be raised by each such plea and motion.

Ground 1 alleged that the indictment was returned in violation of art. 12 of the Declaration of Rights of the Constitution of the Commonwealth, G. L. (Ter. Ed.) c. 277, § 5, the Fourteenth Amendment to the Constitution of the United States, and 18 U. S. C. (1952) § 241. The supporting allegations were that prior to the commencement of the grand jury proceedings the district attorney, his assistants and investigators, "other officials of the Commonwealth," the Federal Bureau of Investigation, and the Federal Department of Justice "issued and caused or permitted to be issued without denial, retraction, minimization or suppression . . . news releases and statements setting forth in great detail: that the so called Brink's robbery had unequivocally been solved; that the said defendants together with other defendants had unequivocally planned and committed the so called Brink's robbery; how the robbery was solved; how the robbery was planned and committed by the said

defendants together with the other defendants; the criminal record and so called background data of each of the defendants; and linking the disappearance, death or murder of others and other crimes with the so called Brink's robbery and the said defendants"; that "such releases and statements appeared under large and sensational headlines and in great detail in every daily newspaper published in Boston and in every, or nearly every, daily newspaper published not only elsewhere in Massachusetts, but throughout the nation"; that "such releases and statements, or detailed summaries thereof, were repeatedly broadcast and televised over radio and television stations located in Massachusetts, as well as over national hook-ups heard and seen in Massachusetts"; and that such "widespread and sensational publicity" was "calculated to and did tend to convince the public, in general, and the grand jury, in particular, of the guilt of each of the defendants and to arouse their animosity, indignation and prejudice towards and against each of the said defendants."

Ground 2 alleged that the return of the indictment was repugnant to art. 12, to c. 277, § 5, and to the Fourteenth Amendment because "unauthorized persons were present in the grand jury room during the proceedings and deliberations of the grand jury returning this indictment."

Ground 3 alleged that the return of the indictment was repugnant to the same provisions as in ground 2, because "prior to, during, and subsequent to, the proceedings conducted by the grand jury returning this indictment" the district attorney, his assistants and investigators, other officials of the Commonwealth, the Federal Bureau of Investigation, and the Federal Department of Justice violated the secrecy of the proceedings "by issuing and causing or permitting to be issued, news releases and statements disclosing what witnesses summoned before such grand jury would testify to, were then testifying to, or had testified to."

Ground 6 alleged that the defendants "are unable to secure a fair and at the same time speedy trial" as guaranteed by arts. 1, 11, and 12 of the Declaration of Rights, the

Fourteenth Amendment, and 18 U. S. C. (1952) § 241. The supporting allegations as to statements since the return of the indictment are similar to those made in ground 1, with additional statements as to "what Joseph 'Specs' O'Keefe, one of the defendants who has heretofore pleaded guilty, or a member of his family . . . said implicating the defendants not only in the Brink's robbery but in other crimes including murder, kidnapping, the escape of 'Trigger' Burke[1] and larceny; how the said Joseph 'Specs' O'Keefe has stated that a $200,000 defence fund had been established by the defendants; how the said Joseph 'Specs' O'Keefe has accused other of the defendants of stealing from him his share of the Brink's robbery loot; how part of the loot had been or was about to be recovered; where the bodies of those supposedly murdered by the defendants had been, or were suspected of being, buried; and how other defendants had confessed"; that such "releases and statements have frequently appeared in magazines having substantial circulations in Massachusetts and throughout the nation"; and that the "news releases and statements and the widespread publicity given them have been calculated to and tend to convince the public in general and any petit jury which may be selected in the future to try this indictment, in particular, of the guilt of each defendant, and to arouse and maintain their animosity, indignation and prejudice towards and against each of the said defendants."

Before trial on the merits the issues raised by the three kinds of special pleadings were considered in the Superior Court on representative papers filed in certain of the cases. This was done for convenience and without objection. While there was no confusion in the Superior Court, these matters, coming here on a lengthy stenographic transcript of the hearing and without copies of all the papers, present themselves to us in time consuming fashion. The judge took up these issues first upon the motions to quash, all of which were denied, and then upon the pleas in abatement, and

---

[1] See *Commonwealth* v. *Locke,* 338 Mass. 682.

finally upon the pleas in bar. He ultimately extended his earlier rulings upon the motions to the pleas, all of which were overruled or disproved.

As the substance and not the name of a pleading controls (*Commonwealth* v. *Wakelin*, 230 Mass. 567, 571; *E. S. Parks Shellac Co.* v. *Jones*, 265 Mass. 108, 110; *Toy* v. *Green*, 319 Mass. 354, 357), we shall consider the several grounds of the pleadings which we have summarized above, under the forms of procedure to which their substance is appropriate.

1. A motion to quash is confined to taking objection to an indictment "for a formal defect apparent on the face thereof." G. L. (Ter. Ed.) c. 278, § 17.[1] It is the equivalent of a demurrer. *United States* v. *Slobodkin*, 48 F. Supp. 913, 915 (D. Mass.). None of the objections was of this character. No argument is made that they were. The motions to quash were rightly denied.

2. The proper purpose of a plea in bar is to set up a ground, not open under a plea of not guilty, which is an absolute defence, not only at the time of filing but for all time. Examples of appropriate pleas in bar are former acquittal, former conviction, and pardon. *United States* v. *Murdock*, 284 U. S. 141, 151. *United States* v. *Brodson*, 234 F. 2d 97, 99 (7th Cir.). *State* v. *Evjue*, 253 Wis. 146, 151–152. Bishop, New Criminal Procedure (2d ed.) §§ 742, 805–809. 14 Am. Jur., Criminal Law, § 262. 22 C. J. S., Criminal Law, § 436. To these may be added the statute of limitations. *United States* v. *Goldman*, 277 U. S. 229. *Capone* v. *Aderhold*, 65 F. 2d 130, 131 (5th Cir.). *United States* v. *Franklin*, 188 F. 2d 182, 186 (7th Cir.). None of the foregoing defences was raised. The defendants' plea in substance that they cannot be tried on the present indictments will be considered under their pleas in abatement.

3. Ground 2, alleging the presence of unauthorized per-

---

[1] "An objection to a complaint, indictment or other criminal process for a formal defect apparent on the face thereof shall be taken by demurrer or by motion to quash, assigning specifically the objections relied on, before a judgment has been rendered by a district court or a trial justice, or before a jury has been sworn in the superior court."

sons in the grand jury room, was matter in abatement. *Lebowitch, petitioner,* 235 Mass. 357, 362. This was properly raised by plea in abatement, to which there was no necessity for a replication by the Commonwealth. *Commonwealth* v. *Kozlowsky,* 238 Mass. 379, 385, 391. It was not error for the trial judge not to require the Commonwealth to file a demurrer or replication to the pleas in abatement, the only special pleadings now material. As was said in the case last cited, "In the absence of express admission, the matters stated in the plea in abatement were at once in issue" (page 385).

The judge rightly ruled that this ground was valid in law. *Jones* v. *Robbins,* 8 Gray, 329, 343–344. *Commonwealth* v. *Harris,* 231 Mass. 584. *Opinion of the Justices,* 232 Mass. 601. He then ruled against it on the basis of the affidavit, which was by counsel and stated that on January 13, 1956, "O'Keefe, accompanied by Captain Wilson of the Boston homicide squad, appeared before the grand jury of Suffolk County." At the hearing on the special pleadings counsel for the defendants informed the court that the only source of the contents of the affidavits was the press. Copies of Boston newspapers dated between January 12 and February 9, 1956, were offered by the defendants and admitted as exhibits at the hearing upon the special pleadings. No newspaper has been pointed out to us which sustains this assertion. The quotation above does not.

It is not correct to contend, as do the defendants, that the judge resolved this issue as one of fact. In making his ruling the judge stated that he was not ruling that the issue should be tried before him first, and then, after he was satisfied, before a jury. He said, "All I am ruling is that if you have any evidence that any unauthorized person was present wrongfully before the grand jury . . . this ground will be sufficient. Now, unless you have testimony to that effect, the court is going to deny this particular ground. The court is not going to permit the defendants to go into a fishing expedition on a mere allegation of counsel without any testimony to back it up."

As the judge was then considering the motions to quash, he referred to the affidavits, which, under Rule 46 of the Superior Court (1954),[1] were applicable only to motions. But his consideration of the same question under the pleas in abatement was subject to a statute of similar import: "The court may refuse to receive a plea in abatement or other dilatory plea to an indictment until its truth has been proved by affidavit or other evidence." G. L. (Ter. Ed.) c. 277, § 74.

4. Ground 3, alleging violation of the secrecy of the grand jury proceedings, by the issuing by State and Federal officials of statements disclosing what witnesses summoned before the grand jury would testify or had testified, is likewise matter in abatement.

When ground 3 was first taken up by the judge on the motions to quash, he ruled that the affidavits did not satisfy the requirements of Rule 46 of the Superior Court (1954); and that in so far as he had any discretion to hear the motions upon the affidavits, or other evidence, he refused to do so, because, assuming that the affidavits were in proper form and substantiated the allegations, and assuming the facts to be true, as matter of law the allegations did not give sufficient grounds for quashing the indictments.

There was no error as to ground 3. No case has been cited or discovered by us which holds that such publicity is a violation of the secrecy of the grand jury room. In Massachusetts, as in England, "the grand jury is deemed to be an informing and accusing body, rather than a judicial tribunal," and the only pertinent statute, which we have, defining their duties is that prescribing their oath of office.[2]

---

[1] "The court need not hear any motion, or opposition thereto, grounded on facts, unless the facts are verified by affidavit, or are apparent upon the record and files, or are agreed and stated in writing signed by the attorneys for the parties interested."

[2] The oath is found in G. L. (Ter. Ed.) c. 277, § 5: "You, as grand jurors . . . do solemnly swear that you will diligently inquire, and true presentment make, of all such matters and things as shall be given you in charge; the commonwealth's counsel, your fellows' and your own, you shall keep secret; you shall present no man for envy, hatred or malice, neither shall you leave any man unpresented for love, fear, favor, affection or hope of reward; but you shall present things truly, as they come to your knowledge, according to the best of your understanding; so help you God."

*Commonwealth* v. *Woodward,* 157 Mass. 516, 517. *Commonwealth* v. *Harris,* 231 Mass. 584, 586. *Commonwealth* v. *Ventura,* 294 Mass. 113, 120. See *Commonwealth* v. *Hill,* 11 Cush. 137, 139–140; *Commonwealth* v. *Mead,* 12 Gray, 167, 170.

In *Commonwealth* v. *McNary,* 246 Mass. 46, and *Commonwealth* v. *Chmielinski,* 246 Mass. 55, convictions for contempt of court were upheld against the defendants, who had sent to the grand jurors letters which, it was held, could be construed as attempts to interfere with the grand jurors' consideration of matters in which the respective defendants were interested adversely to the return of any indictment. The *McNary* case contains much of interest respecting the duties of the grand jury but nothing which is an authority that the present indictments should be abated. See *Attorney Gen.* v. *Pelletier,* 240 Mass. 264, 307–310.

5. There likewise was no error as to ground 1, which sought to invalidate the indictments because of the publicity outlined above. In *Commonwealth* v. *Woodward,* 157 Mass. 516, *supra,* it was held that a plea in abatement was rightly overruled which raised "the question whether an indictment is to be held bad because one of the grand jurors by whom it was found, being otherwise competent and qualified to serve, had before the meeting of the grand jury made a personal investigation into the guilt of the accused, and had secreted himself in a room with an officer for the purpose of listening to declarations and admissions made by the accused concerning the crime, and had heard such declarations and admissions, and had listened to statements of officers to the effect that the accused was guilty, and had thereupon formed an opinion, and believed him to be guilty before and at the time of the investigation of the case by the grand jury" (pages 516–517). At pages 518–519, it was said, "The indictment is merely an accusation or charge of crime. For the protection of the people against unreasonable accusations, there are constitutional and statutory provisions that, with certain exceptions, no person shall be held to answer for crime unless upon indictment. Amendment of Const. of

U. S., Art. 5. Pub. Sts. c. 200, § 3.[1] This means an indictment found in the usual course of proceedings. It is not however necessary that each grand juror shall be free from bias or prejudice, provided he has the general qualifications which are required. Such a test is not implied either from the terms of his oath or from the nature of his duties. If such an inquiry were open, the delays and complexity of criminal trials would be greatly increased, and no correspondingly useful purpose would be served." To the same effect are *Commonwealth* v. *Ryan*, 5 Mass. 90; *Tucker's Case*, 8 Mass. 286; *Commonwealth* v. *Brown*, 147 Mass. 585; *Commonwealth* v. *Hayden*, 163 Mass. 453, 455.

The court will not inquire whether competent evidence was heard by the grand jury. *Commonwealth* v. *Hayden*, 163 Mass. 453, 455. *Commonwealth* v. *Walsh*, 255 Mass. 317, 319. *Commonwealth* v. *Ventura*, 294 Mass. 113, 120. Before the return of an indictment tried in *Commonwealth* v. *Knapp*, 9 Pick. 496, after the charge was delivered to the grand jury, the accused moved that the court instruct the grand jury as to the nature of the evidence proper to be received by them. The court denied the motion stating: "It is to be presumed that only proper evidence will be laid before the jury. There is a difficulty in determining beforehand what may or may not be proper; and it would be inconvenient, to say the least, to instruct them upon hypothetical cases. The law reposes confidence in the officers of the government in relation to this subject. If any thing improper shall be given in evidence before the grand jury, the error may be corrected subsequently upon the trial before the petit jury" (pages 495–496).

Ground 1, accordingly, discloses no violation of art. 12 of the Declaration of Rights. Upon any decisions of the Supreme Court of the United States which have come to our attention, there was no violation of the Fourteenth Amendment. The commencement of a State prosecution for crime by indictment by a grand jury is not required as "due process

---

[1] See now G. L. c. 263, § 4 (as amended through St. 1953, c. 319, § 28).

of law." See *Hurtado* v. *California*, 110 U. S. 516, 521–522, and the reference to Chief Justice Shaw and *Jones* v. *Robbins*, 8 Gray, 329. See also *Kennedy* v. *Walker*, 135 Conn. 262, 273–274; affd. 337 U. S. 901. There was no problem similar to that in *Cassell* v. *Texas*, 339 U. S. 282. There is nothing which merits discussion with respect to 18 U. S. C. (1952) § 241.

6. The sixth ground and the defendants' exception to setting the trial date may conveniently be considered together. Both are based upon allegations as to news releases and as to statements of enforcement officials, Federal and State. Ground 6 embodies a contention that the defendants never can be tried because they never can be given a trial which is both fair and speedy. The treatment of the special pleadings in the court below presents ground 6 on the basis that there would be no reason for abatement of the indictments even if enforcement officials should be found to have issued any statements and news releases contained in the Boston newspapers and several national magazine articles mostly dated between January 12 and the end of February, 1956. The hearing upon the special pleadings at which the newspapers and magazines were marked as exhibits took place on May 17 and 29 and June 1 and 4, 1956. The motions to quash, pleas in abatement, and pleas in bar were denied on June 4. Some of the indictments had been returned on January 13, 1956, and most of them on January 16, 1956. Also on June 4, the judge set the trial date as August 6, 1956. At that time the defendants objected on the ground that they could not get a fair, impartial, and speedy trial. Although invited to do so by the judge, counsel for the defendants made no motion for a continuance. No motion for change of venue was filed, doubtless because of a contention that in no county of the Commonwealth could a fair trial be had.

The newspaper coverage was undoubtedly extensive, and was commensurate with a crime of colossal proportions. In the closing arguments to the jury by counsel for some of the defendants and by the district attorney it was described

as "the biggest armed robbery in the history of the country" and "the biggest robbery in history." If there was publicity created by enforcement officials, this was indefensible. It does not follow, however, that the inevitable result is that the defendants must be released, because they can never constitutionally be tried (see *Delaney* v. *United States*, 199 F. 2d 107, 112 [1st Cir.]), or that these particular indictments should be quashed. Nor must we conclude that these convictions should be set aside because of the trial date.

Let us consider the issue which faced the judge. From the record of the hearing before him, it is clear that there never could have been a date for trial to which the defendants would not have objected. In substance, theirs was a contention that the period of alleged prejudice to the defendants would outlast the entire time, whatever that might be, during which a trial, properly called speedy, might be had. The judge knew that since January 17, 1950, there had been a public realization that a robbery of extraordinary notoriety had remained unsolved. The boldness of its commission and the record amount stolen could not fail to arouse general interest and to stimulate the channels of public information, such as newspapers, magazines, radio, and television. This was no setting for apathy. The judge, whose opinion is entitled to great weight, was in a better position than are we to evaluate the effect of publicity at the time he set the date for trial. His was the primary duty, which the record shows he understood and undertook to discharge with fairness to the defendants and to the citizens of the Commonwealth. Realizing that much publicity as to this bizarre crime was inevitable, and that by far the greater part of that of which the defendants complain occurred in the last half of January and in February, the judge in June could reasonably have concluded that its effect had abated or would abate by August to an extent sufficient to permit a fair trial, particularly with the care reasonably expected to be taken in selecting the petit jury. See *United States* v. *Keegan*, 141 F. 2d 248, 258 (2d Cir.); *United States* v. *Leviton*, 193 F. 2d 848, 857 (2d Cir.).

We cannot say that there was error in dealing with the sixth ground of the special pleadings or that on June 4, 1956, it was an abuse of discretion to select August 6, 1956, as the trial date. See *Commonwealth* v. *Millen*, 289 Mass. 441, 463–464; *Commonwealth* v. *Bonomi*, 335 Mass. 327, 333; 63 Harv. L. Rev. 840, 846–848.

7. On August 6, 1956, the defendants filed further motions to quash, pleas in abatement, and pleas in bar which related to newspaper publications in the interval since the first special pleadings. These were received as exhibits with reference to the new motions and pleas, all of which were respectively denied and overruled. These raise no new point and are governed by what has been hereinbefore said.

8. The defendants excepted to being put on trial on the conspiracy indictments along with the more serious substantive offences. This was matter within the trial judge's discretion of which no abuse appears.

9. The defendants allege error in the examination and selection of jurors, a process which consumed over sixteen trial days from August 7 to 29, 1956. The statistics we take from the defendants' brief. The trial judge examined 1,104 veniremen in open court. He excused 426 who testified that they had disqualifying opinions and 239 because of ill health or other reasons. The Commonwealth peremptorily challenged 163 who had been declared indifferent. The defendants exhausted their 262 peremptory challenges on August 29.[1] Before exercising a peremptory challenge the defendants challenged for cause each prospective juror who had not been excused or challenged peremptorily by the Commonwealth. As to each case the defendants asked

---

[1] General Laws c. 234, § 29 (as amended through St. 1955, c. 485, § 1), read: "Upon the trial of an indictment for a crime punishable by death or imprisonment for life, each defendant shall be entitled to twelve peremptory challenges of the jurors called to try the case, and in other criminal cases each defendant shall be entitled to three such challenges; provided, that each defendant in a capital case in which additional jurors are chosen under section twenty-six B shall be entitled to one additional peremptory challenge for each additional juror. In every criminal case the commonwealth shall be entitled to as many such challenges as equal the whole number to which all the defendants in the case are entitled. . . ." See now G. L. c. 234, § 29 (as amended through St. 1957, c. 335), which was enacted upon the recommendation of the Judicial Council. 1956 Pub. Doc. No. 144, p. 42.

leave to conduct a voir dire examination, moved that there be put certain questions contained in their "motion for questions to jurors," and made offer of proof of the exhibits of newspaper articles which had been offered at the hearings on the special pleadings. They also offered to prove that if a prospective juror should be asked questions 7, 9, 10, 12, 15, 17, 18, and 19,[1] in the "motion for questions to jurors," he would answer in the affirmative. The defendants also excepted whenever the judge declared a venireman indifferent.

In order to understand in proper perspective the exceptions as to the examination and selection of jurors, a close reading of more than 1,500 pages in the typewritten transcript is required. There is thus revealed a patient and careful succession of examinations by the trial judge. Not until the defendants' challenges were exhausted was the first juror seated on the fourteenth day of the trial and the thirteenth day of examining veniremen. Of every one the judge asked the four questions prescribed by G. L. (Ter. Ed.) c. 234, § 28, which reads: ". . . the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein . . . ."

---

[1] "7. Have you read any articles in any newspapers or magazines concerning the Brink's case?"

"9. Have you read or heard that J. Edgar Hoover, Director of the F. B. I. or Herbert Brownell, Attorney General of the United States, or the Department of Justice has said that the Brink's case had been solved and that these defendants had committed that robbery?"

"10. Have you read or heard what J. Edgar Hoover or Herbert Brownell or the Department of Justice has said about how the Brink's case had been solved?"

"12. Have you read or heard what J. Edgar Hoover, Herbert Brownell or the Department of Justice has said about the criminal records and records of arrests of these defendants?"

"15. Have you read or heard how the Brink's case was solved?"

"17. Have you read or heard about the criminal records and records of arrests of these defendants?"

"18. Have you read or heard that Specs O'Keefe has pleaded guilty to participating in the Brink's robbery?"

"19. Have you read or heard that Specs O'Keefe has named these defendants as those who participated with him in committing the Brink's robbery?"

Other questions were asked which, in one instance after another, the judge deemed appropriate. Occasionally, but not always, he put questions suggested by the defendants.

The denial of the "motion for questions to jurors" and the refusal to put other questions, to the extent that they were refused, were within the discretion of the judge. Such has been the long standing practice in this Commonwealth. *Commonwealth* v. *Gee,* 6 Cush. 174, 177–178. *Commonwealth* v. *Burroughs,* 145 Mass. 242, 243–244. *Commonwealth* v. *Trefethen,* 157 Mass. 180, 195–196. *Commonwealth* v. *Phelps,* 209 Mass. 396, 414–415. *Commonwealth* v. *Spencer,* 212 Mass. 438, 444–446. *Commonwealth* v. *Snyder,* 282 Mass. 401, 411. *Commonwealth* v. *Lee,* 324 Mass. 714, 717–718. *Commonwealth* v. *Taylor,* 327 Mass. 641, 646–647. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 333–335.

The defendants quote from an opinion of Mr. Justice Holmes in *Commonwealth* v. *Poisson,* 157 Mass. 510, 512, which we fully approve, that this discretion "is exercised wisely by not going beyond the usual questions, unless something appears which makes it proper to go further." They contend that something further appears in the publicity. The determination of this matter was still in the discretion of the trial judge. As was said in *Commonwealth* v. *DiStasio,* 294 Mass. 273, 280, "In this Commonwealth the examination of prospective jurors is 'under the direction of the court,' whether conducted by counsel, or, as is customary, by the judge. Seldom is it permitted to extend beyond the statutory questions. *Commonwealth* v. *Cero,* 264 Mass. 264, 270, 271. Whether other questions shall be asked is discretionary with the judge. *Commonwealth* v. *Millen,* 289 Mass. 441, 475, 476."

We find no abuse of that discretion. It is not enough to describe the conduct of the voir dire as "pedestrian" or "unimaginative." Without surrendering the direction of the examination to the defendants' counsel, who repeatedly asserted that no unbiased jury could be empanelled, the trial judge spent many hours asking questions which must have numbered up into the thousands. This he continued

to do even while it was apparent that the defendants would exhaust their 262 challenges before a juror would be accepted.

The defendants argue that they were compelled to use forty-five of their peremptory challenges upon forty-five veniremen who were erroneously ruled to be indifferent. Without extending the discussion, we hold that no harmful error is revealed.

The defendants complain as to two jurymen who, they argue, were erroneously declared indifferent and were seated. Because their examinations are typical of the fairness and the carefulness of the judge's conduct of the voir dire, and mere recapitulation refutes the contention of error, we set them forth at length.

Wolusky was the first juror chosen. The material part of the voir dire was as follows: "Q. [THE JUDGE] Have you formed or expressed any opinion as to the guilt or innocence of any of these defendants? A. I don't have a firm opinion. Q. Are you related to any of them? A. No, sir. Q. Have you any connection whatever with Brink's, Incorporated? A. No, I haven't. Q. Have you any personal interest or personal connection with this case? A. No. Q. Are you aware of any bias or prejudice for or against anyone in this case? A. Not that I know of. . . . Q. Have you served on a jury before? A. Yes, sir. THE JUDGE: Then you know what to expect, what is expected of you. . . . The juror is indifferent. . . . COUNSEL FOR THE DEFENDANTS: The same objection and exception and challenge for cause for all defendants. Specifically we object and except to Your Honor's ruling that the venireman stands indifferent, because of the statement that he, and I quote, said, 'I don't have a firm opinion,' which indicates he has some opinion. . . . THE JUDGE: Very well. When I asked you that question I understood that you would be able to take the oath of a juror, to well and truly try the issues between the Commonwealth and the defendants, according to the evidence. That would be uninfluenced in any way by any preconceived notions. . . . THE JUROR: You are right, because I don't convict anyone unless I know the facts, and I don't know the facts."

The judge, at the request of the defendants, asked, "Are you acquainted with any of the lawyers for the defendants or attorneys for the Commonwealth; and if so, is that acquaintance such as to embarrass you in any way in hearing this case?" To which the juror answered, "I don't know any of them."

The other juryman was Leary, the fourteenth and last juror chosen. The material part of the voir dire was as follows: "Q. Do you know of any reason why you cannot serve on this jury? A. No, Your Honor. Q. Have you expressed or formed any opinion as to the guilt or innocence of any of these defendants? A. I have a tentative opinion; could be changed. Q. You have a tentative opinion. Have you served on the jury before? A. No, Your Honor. Q. If you are accepted as a juror, an oath will be administered to you that you will well and truly try the issues between the Commonwealth and these defendants, according to the evidence, which means that you should serve with an open mind and decide the case purely on the evidence as it will be presented here, uninfluenced by any preconceived notion, ideas, or opinions that you may now have. Do you think you could take that oath and adhere to it faithfully? A. I do, Your Honor. Q. Very well. You are not related to any of these defendants? A. No, Your Honor. Q. And you never had any connection with Brink's in any way? A. No, sir. Q. You have no personal interest in this case? A. None whatever, Your Honor. Q. Are you aware of any prejudice or bias for or against anyone in this case? A. No, Your Honor. Q. Do you know of any reason that would prevent you from reaching a fair and impartial decision or verdict exclusively on the evidence and under the law as the court will give you the law? A. No. . . . COUNSEL FOR ONE OF THE DEFENDANTS: If Your Honor please, before the juror is sworn, since the interrogation has indicated that the juror testified that he had a tentative opinion, but it could be changed, would Your Honor address questions to the juror as to whether or not he knows how much evidence would be necessary to change his opinion?

Q. [By the judge] Mr. Leary, if you are sworn as a juror, you will be instructed by the court that every defendant is presumed to be innocent, and that it will be your duty to bring in a verdict, return a verdict of not guilty, unless you are convinced beyond a reasonable doubt on the evidence and the law that he is guilty. Now, do you think that your opinion, or whatever notions you have, will interfere with carrying out that oath, those instructions? A. No, Your Honor."

There is one other complaint as to the selection of the jury which we shall discuss. This has to do with Jacoby, who was accepted and sworn as the ninth juror. He had stated that he had neither expressed nor had any opinion as to the guilt or innocence of any of the defendants and that he had no bias or prejudice for or against anyone in the case. After being segregated with the other eight jurors for two days, he desired to address the court. He then testified, "I didn't realize it was the Brink's case when I was called, and I have become emotionally upset about this whole business, and I don't seem to fit into the group at all that have already been selected, and I wish to be excused." The voir dire continued: "Q. [By the judge] What do you mean when you say you didn't know this was going to be the Brink's case? Did you have an opinion about the Brink's case? A. I have read in the papers a little bit about it. Q. So that you have formed an opinion about the Brink's case? A. Yes, I have, sir. THE JUDGE: Well, then, the court will excuse you as a juror." The action of the judge was proper. *Commonwealth* v. *Galvin*, 323 Mass. 205, 213–214. At the time no objection was made.

After two more prospective jurors were examined, one of whom was accepted, the defendants moved for a mistrial on the grounds that Jacoby, who had had an opportunity to discuss this matter with other jurors who had been sworn, had been "excused because of an opinion which apparently he had prior to his being accepted as a juryman." The defendants also moved that the judge interrogate the eight jurymen as to whether there had been any discussions with Jacoby concerning the case. Both motions were denied.

Their denial was within the judge's discretion. In *Commonwealth* v. *Phelps*, 209 Mass. 396, 415, it was held, even in a capital case, that a defendant did not have a right to have the jurors who had been sworn and empanelled kept together before the empanelling was completed. In *Commonwealth* v. *Bellino*, 320 Mass. 635, 641, it was said, "We see nothing of consequence in the fact that during the trial fourteen men instead of twelve may have discussed among themselves various aspects of the case, and that remarks of those who subsequently were discharged may have made some impression upon the twelve that remained."

10. The defendants attack a number of miscellaneous rulings in the admission of evidence. None of the evidence complained of was expressly admitted for the purpose of corroboration. The defendants' position is that the witnesses who gave it could have been called for no other purpose than to convince the jury of the truth of O'Keefe's testimony. They object that the evidence did not tend to connect them with the crimes charged, and that the effect of the evidence was to corroborate the testimony of an accomplice on a collateral point not material to their guilt. Reliance is placed chiefly upon *Commonwealth* v. *Holmes*, 127 Mass. 424. Evidence not admitted as corroborative does not fall within the rule of that case. *Commonwealth* v. *Wilson*, 152 Mass. 12, 15. Without unduly prolonging the discussion, it is our opinion that the evidence under attack tended to show the method of carrying out the objects of the armed robbery and the conspiracy to commit it. "Evidence of the attendant circumstances may aid the jury in reaching a verdict by giving them the complete picture." *Commonwealth* v. *Durkin*, 257 Mass. 426, 428. *Commonwealth* v. *Simpson*, 300 Mass. 45, 50.

11. The defendants assert briefly that it was error not to limit the time to which questions directed to the witness O'Keefe related, on the ground that the field was opened for irrelevant and collateral matters and the defence was hampered in its cross-examination. This was within the discretion of the judge.

12. O'Keefe testified to two conversations after the robbery. In the latter part of February, 1950, he asked McGinnis for his money, and later by appointment went with Gusciora to a designated place where they met Mc-Ginnis and Banfield and obtained two suitcases, each taking one. In his suitcase was $98,000. O'Keefe also testified that subsequent to the discovery on March 4, 1950, of the cut-up truck (used in the robbery) in the Stoughton dump he talked with McGinnis and asked why the truck had been dumped in the very town where Gusciora and he lived, and that McGinnis replied that he did not know that O'Keefe lived in Stoughton. This testimony appears to have been admitted against the defendants generally. The defendants contend that both conversations should have been limited to McGinnis under appropriate instructions to the jury. The first conversation was admissible as showing a disposition of the loot, which was the main object of the enterprise. As to the second conversation the judge in two places in his charge told the jury precisely what the defendants argue that he should have done, namely that the evidence was admissible against McGinnis only.

13. In the cross-examination of O'Keefe he was asked, "Do you know a man by the name of William Kimball?" The question was excluded, and the defendants' counsel made an offer of proof that the answer would be "Yes." The defendants contend that they were precluded from showing the probability that some persons other than they committed the crime. There was colloquy at the bench on the day before the ruling was finally made. "THE JUDGE: This is cross-examination and I should give you a wider latitude. If you are going to connect Kimball up, all right, but just merely insinuation wouldn't be enough. Now, I don't want you to disclose your purpose, but leaving it in the air is not enough. COUNSEL FOR THE DEFENDANTS: All I know is that you have said to me, Judge, when I objected, that you assumed that there is going to be something to connect it up. THE JUDGE: That was because I heard the district attorney's opening. I haven't heard any opening

from you. Now, if you are going to tell me now that you are going to introduce evidence that Kimball had something to do with this, I will take your word for it. COUNSEL FOR THE DEFENDANTS: The witness asked me — and there was no objection at the time — to name the chief or the boss of this thing, and I am getting ready to do so. ASSISTANT DISTRICT ATTORNEY: Oh, no, no. THE JUDGE: Not unless you have evidence. COUNSEL FOR THE DEFENDANTS: I have an affidavit. What am I supposed to do, introduce it now and let them see it? THE JUDGE: No, but you have got to produce it by creditable evidence. I will take your word for it. You don't have to produce for me any affidavit." Later in the colloquy the judge said, "If you tell me that you are going to produce credible evidence in mentioning that name, I will allow you to do it." The defendants contend that the judge made a demand that they produce credible evidence. It is clear from the lengthy quotation we have made that all the judge meant, or could reasonably have been understood to mean, was that counsel, who had made no opening, should merely give his word that he would connect up the evidence.

14. The defendants offered to show through one Humphrey, the manager for Brink's, Incorporated, that a reward had been offered, and published in the Boston newspapers, for the apprehension and conviction of those who had committed the robbery. The defendants were not permitted to do this, and now contend, although they did not so state at the time of the offer, that this evidence was admissible to show that O'Keefe in testifying was actuated by hope of this reward. It may be observed that as a participant in the crime, O'Keefe could not have become a participant in the reward. *Jenkins* v. *Kelren,* 12 Gray, 330, 332. 46 Am. Jur., Rewards, § 16. 77 C. J. S., Rewards, § 37. Futhermore, in the absence of any statement as to the purpose of the offer, the judge was justified in rejecting it.

15. The defendants, at a time when no witness was on the stand, offered photostatic copies of certain pages of Boston newspapers for various dates in January, 1950. The Com-

monwealth agreed that these might be used in place of the originals, but made objection on the ground of materiality, and the objection was sustained. The purpose of the offer was to show that O'Keefe could have gained his familiarity with the Brink's premises from plans, diagrams, and descriptions contained in those newspapers. There was no testimony that the plans, diagrams, and descriptions were authentic, or that if O'Keefe ever read them they corresponded with his testimony. There was no error in the exclusion of these newspapers.

16. A chauffeur, called as a witness by the defendants on October 3, 1956, testified that on that date at their request he had driven from the Brink's premises at 165 Prince Street to 14 Bickford Avenue, Roxbury, where Maffie's parents lived, and thence to Egleston Square, near McGinnis's store. This route was that which O'Keefe had testified had been taken by the participants in the robbery. The purpose of the evidence was to show that the defendant Pino could not have been in Egleston Square on the evening of January 17, 1950, at the time witnesses had placed him there and still have been a participant in the robbery. The evidence could have been excluded on the ground that the traffic, weather, and light conditions were not shown to be sufficiently similar. No offer of proof was made as to the time the witness took to drive from Prince Street to Bickford Avenue, but an offer of proof was made that it took three minutes to go from Bickford Avenue to Egleston Square. As there was nothing to show the total time for the entire trip taken by the witness, no harm to the defendants is apparent.

17. The defendants Faherty and Richardson raise questions of evidence not applicable to the other defendants.

(a) The other defendants were arrested on January 12, 1956. There was evidence that these two defendants were absent from their homes and customary vocations from January 12, 1956, to May 16, 1956, when they were arrested in an apartment at 87 Coleman Street, Dorchester, by F. B. I. agents, who had Federal warrants for both. They

contend that since Federal and State offences are separate and distinct crimes against different sovereigns, even though arising out of the same facts, evidence of flight, hiding, or disguise was not admissible to show consciousness of guilt in favor of either sovereign. The general principle is not contested that evidence of flight of one accused of a crime is admissible as some evidence of consciousness of guilt. *Commonwealth v. Brigham*, 147 Mass. 414, 415. *Commonwealth v. Goldberg*, 212 Mass. 88, 91. *Commonwealth v. Cline*, 213 Mass. 225, 227. *Commonwealth v. Corcoran*, 332 Mass. 615, 619. Wigmore on Evidence (3d ed.) § 276. 25 A. L. R. 886. It has been held elsewhere that mere evidence of flight where an accused is charged with more than one offence may be a matter of conjecture. *People v. McKeon*, 64 Hun, 504, 506. But where the evidence has probative force with respect to the crime charged, it does not become inadmissible merely because it also tended to show the commission of another crime. *Commonwealth v. Madeiros*, 255 Mass. 304, 314. *State v. Bonning*, 60 Mont. 362, 365–366. The robbery with which the defendants were charged violated both State and Federal law. It would be naive to reject the evidence here considered as lacking pertinency as to the crimes of which the defendants have been tried and convicted. We refer to the testimony of the special agents of the Federal Bureau of Investigation that the color of Richardson's hair had become reddish brown instead of grey as usual; the presence in the apartment of loaded weapons, ammunition, a hair cutter, and a bottle of preparation to recolor hair; and the efforts to locate Faherty by television and otherwise. *State v. Lucey*, 24 Mont. 295, 303. *People v. Ogle*, 104 N. Y. 511, 513–514. *State v. Falcone*, 41 R. I. 399, 400–401.

(b) Richardson assigns error that there were not admitted in evidence two records of the United States Commissioner, District of Massachusetts, of proceedings on complaints dated January 19, 1956, by John P. Larkin, special agent of the F. B. I., one against Faherty and one against Richardson. The charge in each case was violation of 18 U. S. C. (1952) § 1073, in that the defendant "did move and travel

in interstate commerce with intent to avoid prosecution for the crime of armed robbery, as defined by the laws of the Commonwealth of Massachusetts, for the commission of which crime a warrant for his arrest had been issued by the Superior Court" for Suffolk County. The records each show that the proceedings taken were on May 16, 1956, that the defendant was presented, and discharged on the recommendation of the government. The record of the trial in the cases at bar shows that these records were offered for identification, and that they were so marked, subject to the exception of Faherty and Richardson. We shall assume that the exception is to failure to admit in evidence. The argument is made that these records were admissible on the issue of flight and that the defendants were not hiding from the Commonwealth. It does not appear that this ground of admissibility was brought to the attention of the judge. In any event, the defendant who assigns error was not harmed, because the records would have been certified proof to the contrary of his contention and would tend to show that he had fled to escape the charge of armed robbery made in the Superior Court.

(c) Faherty and Richardson severally assign errors as to statements which F. B. I. agents and police officers testified that each made. We shall not pause to analyze those questions as to which no exception was taken or which are not now argued. Nor shall we unduly extend this opinion by a discussion of evidence admitted without objection and later sought to be struck out because the question was allegedly improper but not because of alleged impropriety of the answer. "The rule generally prevailing in this Commonwealth is that objections to matters of evidence must be seasonably made and exceptions taken when the evidence is offered . . .; and a party cannot of right insist upon saving an exception to evidence by thereafter seeking to have the evidence struck out . . . ." *Commonwealth* v. *Theberge,* 330 Mass. 520, 527. See *Boyle* v. *Columbian Fire Proofing Co.* 182 Mass. 93, 99; *Commonwealth* v. *Doyle,* 323 Mass. 633, 634–635.

Special agent McNamara of the F. B. I. testified that he interviewed the defendant Richardson at the office of the F. B. I. in Boston. Richardson, asked if he had participated in the Brink's robbery, said that he had not; that he did not know where he had been on that day; and that if he was not working, he was probably drunk. Informed that he did not work, he repeated that he was probably drunk. Asked at what time he left the house in the morning, he said that he probably left at 7:45; and that he could not recall what bars he went to. He said that he knew Geagan; had been acquainted with Faherty for a number of years; was a close friend of Pino and had worked for him; and that he had known Costa for a great many years, and had worked for him also. The conversation was admissible and the question asking for it was proper. If any portion of the answer was objectionable for any reason, a motion to strike was the proper procedure. *Jacobs* v. *Cromwell*, 216 Mass. 182, 184. *Commonwealth* v. *Anderson*, 220 Mass. 142, 145. *Commonwealth* v. *Rudnick*, 318 Mass. 45, 62. At one point in McNamara's testimony the judge stated that in order to save the necessity of objections by counsel for the other defendants, anything that Richardson was alleged to have said was admissible against him. This was not a ruling that the judge was admitting as evidence anything that anybody might testify that Richardson said, no matter where, when, or in what circumstances.

A similar unreasonable construction is attempted to be placed upon the testimony of one Shanahan, a police stenographer, who transcribed notes of interrogations of Richardson and of Faherty by Captain Wilson of the Boston police. A copy of the stenographic statements had been given to counsel for these defendants, who had marked questions to which he objected. During a long colloquy the latter said, "As to the statement on Faherty, it is obviously imperfect because parts of it are not admissible. He was silent after being confronted with questions." The judge replied, "Anything the man says at any time is admissible," and the assistant district attorney added, "These excerpts of it are."

The assistant district attorney said that he would not read the "silent ones." The only other objection was to one question which was contended to be unintelligible. There was no error in these respects. Having stated specifically the basis of their objections, they cannot urge other grounds in this court. *Kagan* v. *Levenson*, 334 Mass. 100, 107, and cases cited. Wigmore on Evidence (3d ed.) § 18.

18. At the close of the evidence the defendants' counsel directed the judge's attention to certain statements in the district attorney's opening which were said not to be borne out by evidence. At the conclusion of the charge there was no exception taken on this matter. Assuming the question to be open, we note the contention that it was error not to instruct the jury to disregard those statements. We do not agree. Near the beginning of the charge the judge said, "Of course, as I said before, what counsel — and I mean now the district attorney as well as counsel for the defendants — say to you in their openings and through the course of the trial, or in their summations, is not evidence. You are to judge the case, weigh the case absolutely on what evidence has been presented here during the trial." Similarly, statements had been made by counsel during the course of the trial. For example, the district attorney near the beginning of his opening had made a clear statement that the opening was not evidence but merely a preview of what the Commonwealth expected to prove. After the Commonwealth had closed its direct case, counsel for the defendants stated to the jury, "the district attorney of Suffolk County, who opened for the Commonwealth — and I might say opened in a very proper and intellectual manner — instructed you people generally in his opening as to what an opening meant."

19. At the conclusion of the district attorney's closing argument, it having been agreed that objections would have the same effect as though taken during the argument, counsel for the defendants orally requested the judge to instruct the jury to disregard certain portions thereof. The judge denied most of these requests, and saved exceptions to the

denial. In these circumstances, failure to renew the exceptions at the close of the charge was not fatal. *London* v. *Bay State St. Ry.* 231 Mass. 480. *Doherty* v. *Levine,* 278 Mass. 418, 419–420. *Heina* v. *Broadway Fruit Mkt. Inc.* 304 Mass. 608, 610–611. *Commonwealth* v. *Domanski,* 332 Mass. 66, 70–71. Cf. *Commonwealth* v. *Cabot,* 241 Mass. 131, 151.

(a) The first group of exceptions concerns references to the Federal Bureau of Investigation; to Agent Powers, the head of its Massachusetts district; and to Agent Larkin. These two agents did not testify, but many of the bureau's employees did. The bureau had been mentioned many times in the course of the trial. O'Keefe had testified that he had first told his story to Agents Powers, Larkin, and Kehoe. In the arguments of two of the defence counsel, the F. B. I. had been portrayed or named in terms which, even on a mild construction, were quite derogatory. In the wake of such arguments, the district attorney could, without impropriety, refer to Powers and Larkin, who had been associated with the prosecution, and to the Federal Bureau of Investigation, and to its aims and ideals. It is inaccurate to charge that the district attorney injected the F. B. I. into his argument.

(b) The defendants assign error in the refusal of the judge to instruct the jury that there was no evidence certain bags were "peculiar to longshoremen." There was no error. To begin with, the district attorney did not use this expression. What he said was: "[W]ho could get those bags? Where would you get bags like those with the names of a foreign country on them? Who could get them? Geagan? Yes. Geagan and Richardson." There was evidence that two bags marked as exhibits were found on the dump at Stoughton with the pieces of the destroyed truck. O'Keefe testified that "Richardson and Baker were told that they would have to carry in the bags that we were to use to carry out the stuff. . . . Tony [Pino] spoke to Geagan and Richardson and said that in view of the fact that they had access to the type of bag we wanted, they should procure them. . . .

They both said they would do that." O'Keefe identified one of the bags as being "one of the bags that we took there . . . [or] a brother to it."

(c) Error is assigned that the judge refused "to instruct the jury specifically with reference to the $60,000 referred to by the district attorney in his closing argument as 'trouble money' that it was introduced solely with respect to the issue of robbery but was not connected with any of the defendants." What the district attorney said was, "You remember the testimony of 'Specs' O'Keefe when he said, 'We took $10,000 and we put it aside. It was trouble money that could have been detected. It could have been readily detected because it was new money.' That was the money that McGinnis was to destroy. You will have approximately $60,000 of that money, Mr. Foreman and Gentlemen of the Jury, and there are the ten $1,000 bills."

There was no error. O'Keefe testified that they counted the money at the Maffie house immediately after the robbery; that one package contained ten $1,000 bills in new money; that there was $96,000 or $98,000 of new money (whether in addition to the $10,000 is not clear); that they did not "figure" that they would be able to use it, and that the $10,000 (at any rate) was put upon the mantel piece, later to be destroyed; that McGinnis said that it was a shame that they could not use that money, and suggested running it through a washing machine with coffee for color to make it look old; and that everybody there said that that was not practical, and that they wanted it burned.

(d) There was no error in refusing to instruct the jury that there was no evidence that the defendants Faherty and Richardson were potential murderers. There was testimony that when they were captured they had loaded guns. The district attorney had argued: "Now, Faherty and Richardson. Let's see where they were, Mr. Foreman and Gentlemen of the Jury. And when you go in there, I want you to take this little instrument with you. They are not gunmen? They are not potential murderers? They are not robbers? Well, Mr. Foreman, take that little weapon and

swing it around so that you can look in there. These guns were loaded."

(e) There was no error with respect to the district attorney's reading from *Commonwealth* v. *Webster,* 5 Cush. 295, 319, "This [an alibi] is a defence often attempted by contrivance, subornation, and perjury. The proof, therefore, offered to sustain it, is to be subjected to a rigid scrutiny." The judge refused to instruct the jury specifically that this quotation should not be considered by them as the law. He did, however, give a general instruction, in substance, that it was the duty of the court to instruct on the law.

20. The defendants assign error that the judge failed to charge that there was no evidence corroborating O'Keefe. They concede that there is no rule of law in this Commonwealth that such instructions be given. There was no error in this respect. See *Commonwealth* v. *Wilson,* 152 Mass. 12, 15; *Commonwealth* v. *Bishop,* 165 Mass. 148, 150; *Commonwealth* v. *Phelps,* 192 Mass. 591, 595; *Commonwealth* v. *Leger,* 264 Mass. 217, 220; *Commonwealth* v. *Lammi,* 310 Mass. 159, 164–165. We do not intimate that such corroborative evidence was lacking.

21. The defendant McGinnis, who was charged in certain indictments with being an accessory before the fact, assigns error in that the judge refused to instruct the jury that he could be found guilty only if he committed accessory acts on or after December 16, 1949, or if St. 1955, c. 781, was unconstitutional as ex post facto, on or after January 16, 1950. His contention, for which he states he has found no authority, is that the "offence is completed on the date on which the accessory last incites, procures, aids, counsels, hires, and commands the principal to commit the substantive offence, and not on the date when the substantive offence was committed." We do not accept this contention. "One becomes an accessory before the fact by the commission of a felony by another whom he has urged to commit it." *Commonwealth* v. *Bloomberg,* 302 Mass. 349, 356. McGinnis became an accessory by the commission of the several crimes

by the respective principals on January 17, 1950. This was within the six year statute of limitations contained in G. L. (Ter. Ed.) c. 277, § 63, before it was amended to ten years by St. 1955, c. 781, which took effect on December 15, 1955. *Imholte* v. *United States,* 226 F. 2d 585, 589 (8th Cir.).

*Judgments affirmed.*